717 S.E.2d 589

CROSSMANN COMMUNITIES OF NORTH CAROLINA, INC., Beazer Homes Investment Corp., and Daniel Rogers, Respondents/Appellants,

v.

HARLEYSVILLE MUTUAL INSURANCE COMPANY, Cincinnati Insurance Company, and Associated Insurors, Inc., of Myrtle Beach, Defendants,

of whom Harleysville Mutual Insurance Company is, Appellant/Respondent.

No. 26909.

Supreme Court of South Carolina.

Re-heard May 23, 2011.
Re-filed Aug. 22, 2011.

C. Mitchell Brown, William C. Wood, Jr., Matthew D. Patterson, and A. Mattison Bogan, of Nelson Mullins Riley & Scarborough, of Columbia; Clifford Leon Welsh, of Welsh & Hughes, of North Myrtle Beach; David L. Brown, of Pinto Coates Kyre & Brown, PLLC, of Greensboro, North Carolina; Robert Curt Calamari, of McAngus Goudelock & Courie, LLC, of Myrtle Beach, for Appellant/Respondent.

David B. Miller, of Bellamy, Rutenberg, Copeland, Epps, Gravely & Bowers, P.A., of Myrtle Beach; Martin M. McNerney, Emily R. Sweet, and Zachary D. Tripp, of King & Spalding, LLP, of Washington, D.C., for Respondents/Appellants.

Stephen P. Groves, Sr., of Nexsen Pruet, LLC, of Charleston, and John J. Piegore, of Sanchez, Daniels & Hoffman, of Chicago, Illinois, for Amicus Curiae Property Casualty Insurers Association of America.

James L. Bruner, William D. Britt, Jr., Benjamin C. Bruner, and Matthew H. Stabler, of Bruner Powell Wall & Mullins, LLC, of Columbia, for Amici Curiae Associated General Contractors of America, Inc., and Carolinas AGC, Inc.

N. Ward Lambert and R. Patrick Smith, of Harper, Lambert & Brown, P.A., of Greenville, for Amici Curiae Associated Builders and Contractors of the Carolinas, Inc., and the School District of Greenville County.

Edwin Russell Jeter, Jr., of Jeter & Williams, P.A., of Columbia, for Amicus Curiae Leading Builders of America.

Charles H. McDonald and Daniel T. Brailsford, of Robinson, McFadden & Moore, PC, of Columbia, for Amici Curiae American Subcontractors Association of the Carolinas and Mechanical Contractors Association of South Carolina.

Robert L. Widener, Benjamin E. Nicholson, V, and A. Victor Rawl, of McNair Law Firm, P.A., of Columbia, for Amici Curiae Home Builders Association of South Carolina and the National Association of Home Builders.

J. Cameron Halford, of Halford, Niemiec & Freeman, L.L.P., of Fort Mill, for Amicus Curiae Ledgestone Court Residents of York County.

John P. Henry, of Thompson & Henry, P.A., of Conway, for Amicus Curiae Riverwalk at Arrowhead Country Club Property Owners Association, Inc., et al.

Justin Lucey, of Justin O'Toole Lucey, P.A., of Mt. Pleasant, for Amicus Curiae Medical University of South Carolina.

George E. Mullen, of Mullen Wylie, LLC, of Hilton Head Island, for Amicus Curiae Coastal Carolina University Student Housing Foundation.

W. Jefferson Leath, Jr., and Michael S. Seekings, of Leath, Bouch & Seekings, LLP, of Charleston, for Amici Curiae Community Associations Institute and the South Carolina Chapter of the Community Associations Institute.

H. Brewton Hagood, of Rosen Rosen & Hagood, LLC, of Charleston, for Amicus Curiae Charleston County School District.

Justice KITTREDGE.

In this commercial general liability ("CGL") policy dispute, we issued an opinion on January 7, 2011, finding no coverage. We subsequently granted a rehearing petition and received numerous amici briefs. Today, we withdraw our initial opinion and issue this opinion, finding the CGL policies provide coverage for the stipulated progressive property damages.

Appellant/Respondent Harleysville Mutual Insurance Company ("Harleysville") issued a series of standard CGL policies to the Respondent developers or their predecessors (collectively "Crossmann") for a series of condominium projects in the Myrtle Beach area of South Carolina. The exterior components of the condominium projects were negligently constructed, which resulted in water penetration and progressive damage to otherwise nondefective components of the condominium projects. The homeowners settled their lawsuits against Respondents. Crossmann then filed this declaratory judgment action to determine coverage under Harleysville's policies. Prior to trial, several of Crossmann's other insurers settled with Crossmann, providing coverage for the homeowners' claims. Based on the remaining parties' stipulations and our suggestion in *L–J, Inc. v. Bituminous Fire & Marine Insurance Co.*, 366 S.C. 117, 123 n. 4, 621 S.E.2d 33, 36 n. 4 (2005), that a "CGL policy may ... provide coverage in cases where faulty workmanship causes ... damage to other property," the trial court determined the homeowners' claims were covered by Harleysville's policies.[1] We affirm the finding of coverage.

---

1. Prior to the trial court's decision, Crossmann consented to the dismissal of its claims against Defendant Associated Insurors, Inc.

Defendant Cincinnati Insurance Company only issued excess insurance policies to Crossmann. Because the trial court found Harleys-

The finding of coverage requires that we address a matter not reached in our initial and now withdrawn opinion. Harleysville appeals from the trial court's determination that its liability to Crossmann is joint and several with Crossmann's other CGL insurers. We reverse the finding of joint and several liability and find the scope of Harleysville's liability is limited to damages accrued during its "time on the risk." In so ruling, we adhere to our holding in *Joe Harden Builders, Inc. v. Aetna Casualty & Surety Co.*, 326 S.C. 231, 486 S.E.2d 89 (1997), but overrule *Century Indemnity Co. v. Golden Hills Builders, Inc.*, 348 S.C. 559, 561 S.E.2d 355 (2002). Using our "time on risk" framework, the allocation of the damage award against Crossmann must conform to the actual distribution of property damage across the progressive damage period. Where proof of the actual property damage distribution is not available, the allocation formula adopted herein will serve as an appropriate default method for dividing the loss among Crossmann's insurers. We remand to the trial court for further consideration of the "time on risk" allocation.

## I.

Crossmann constructed multiple condominium projects from 1992 through 1999, which are at issue in this case. Crossmann utilized subcontractors to construct the condominium projects. In 2001, the homeowners filed suit against Crossmann after they discovered construction defects and resulting problems with the units. The homeowners alleged Crossmann defectively constructed the units, and as a result, the units experienced substantial decay and deterioration. Crossmann settled with the homeowners for approximately $16.8 million.

Following the settlement, Crossmann sought coverage for damages arising out of the lawsuit pursuant to their CGL policies issued by Harleysville, but Harleysville denied that coverage was triggered. Crossmann filed a declaratory judgment action to determine whether the policies covered the homeowners' damages. The parties stipulated to the facts

ville's policies were sufficient to indemnify the entire $7.2 million in stipulated damages, it did not rule on whether Cincinnati's policies provided coverage, though it did find that the homeowners in the underlying lawsuits suffered property damage during Cincinnati's policy periods.

and amount of damages and only presented the coverage and allocation questions to the trial court.

The parties' stipulations presented the coverage question on the basis of the presence or absence of an "occurrence." The parties stipulated to, among other things, the amount of damages, that the damage resulting from water intrusion constituted "property damage," that the damage began within thirty days after the certificate of occupancy was issued for each building, that the damage progressed until repaired or until Beazer Homes paid to settle the homeowners' claims, and that the parties would not argue the applicability of any policy exclusions.

Relying on *L–J, Inc. v. Bituminous Fire & Marine Insurance Co.,* 366 S.C. 117, 123 n. 4, 621 S.E.2d 33, 36 n. 4 (2005), and the ambiguity in the language of the CGL policies, the trial court ruled that the progressive damage "that resulted from, and was in addition to, the subcontractors' negligent work itself" was caused by an "occurrence." The trial court issued its order prior to our recent decision in *Auto Owners Insurance Co. v. Newman ("Newman"),* 385 S.C. 187, 684 S.E.2d 541 (2009). However, as discussed below, *Newman* further supports this result. The trial court also ruled that Harleysville was jointly and severally liable and was not entitled to a set-off based on other insurers' pre-trial settlements with Crossmann.[2] Additionally, the trial court found that Crossmann was entitled to an award of post-judgment interest but not prejudgment interest. Both parties have appealed the trial court's order.

## II.

 "A declaratory judgment action is neither legal nor equitable, and therefore, the standard of review is determined by the nature of the underlying issue." *Newman,* 385 S.C. at 191, 684 S.E.2d at 543. "When the purpose of the underlying dispute is to determine whether coverage exists under an insurance policy, the action is one at law." *Id.* "In an action at law tried without a jury, the appellate court will not disturb the trial court's findings of fact unless there is no evidence to

---

2. Prior to trial, Crossmann settled with their other insurance companies for $8.6 million.

reasonably support them." *Id.* In this case, the parties have stipulated to the facts, and thus we are presented with a question of law. Where the action presents a question of law, as does this declaratory action, this Court's review is plenary and without deference to the trial court. *J.K. Constr., Inc. v. W. Carolina Reg'l Sewer Authority,* 336 S.C. 162, 166, 519 S.E.2d 561, 563 (1999).

## III.

### Commercial General Liability Policies and the Coverage Question in a Progressive Damage Case

#### A.

■■■■ We affirm the trial court's finding of coverage based on an "occurrence." An occurrence was once simply defined as an "accident." However, in 1966, the occurrence definition was expanded to include "continuous or repeated exposure to substantially the same general harmful conditions." [3] This Court, among others, has struggled to discern the meaning of the expanded occurrence definition in the context of progressive damage cases. The lack of a clear meaning, we believe, leaves us with an ambiguity, which we must construe against the insurer. *See Super Duper Inc. v. Pennsylvania Nat'l Mut. Cas. Ins. Co.,* 385 S.C. 201, 210, 683 S.E.2d 792, 796 (2009) ("Ambiguous terms must be construed in favor of the insured."). Accordingly, we construe the ambiguous definition of occurrence in favor of the insured, Crossmann, and find the insuring language of the policies was triggered by the damages caused by repeated water intrusion.[4]

---

**3.** Although not necessary to the disposition of this appeal, we note that language included in the 1966 occurrence definition requiring the property damage to be neither expected nor intended was eliminated from the definition during the 1986 CGL revisions. However, the unexpected and unintended concept was retained in a policy exclusion.

**4.** We are aware that this construction may be at odds with a more limited nature of coverage actually intended by policyholders and the insurance industry. However, if insurers intend to preclude this construction, it is incumbent upon them to include clear language accomplishing this result. *See United States Fire Ins. Co. v. J.S.U.B., Inc.,* 979 So.2d 871, 884 (Fla.2007) (finding it is incumbent upon insurers to include clear language expressing the parties' intent regarding the

## B.

While we adhere to the result in *Newman,* because progressive damage cases often are highly complex and involve many stakeholders, we elect to clarify the applicable legal framework for determining whether coverage is triggered.

In *Newman,* a homeowner brought a suit against a builder alleging breach of warranty, breach of contract, and negligence. The homeowner established that a subcontractor negligently applied stucco to the side of her house and, as a result, progressive damage ensued as water seeped into the home causing damage to the home's framing and exterior sheathing.

We held that the costs of replacing the defective application of the stucco were not covered by the builder's CGL policy, but the damage caused by the continuous moisture intrusion resulting from the subcontractor's negligence did fall within the CGL's expansive definition of an occurrence. We analyzed *Newman* solely through the lens of whether there was an occurrence, specifically a "continuous or repeated exposure to substantially the same harmful conditions." 385 S.C. at 194, 684 S.E.2d at 544–45 (citing *Travelers Indem. Co. of America v. Moore & Assocs., Inc.,* 216 S.W.3d 302, 309 (Tenn.2007)).

We believe a more complete understanding of the coverage issue in this kind of progressive property damage case should involve the policy term "property damage." The standard CGL policy defines "property damage" in two different ways, as follows:

 a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

 b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.[5]

---

scope of coverage and noting the availability of particular endorsements to address or clarify the parties' intent).

5. Harleysville's policies employed these standard definitions, with the exception that some of its policies omitted the second sentence from definition "a."

With respect to the first quoted definition of "property damage," the critical phrase is "physical injury," which suggests the property was not defective at the outset, but rather was initially proper and injured thereafter. We emphasize the "difference between a claim for the costs of repairing or removing defective work, which is not a claim for 'property damage,' and a claim for the costs of repairing damage caused by the defective work, which is a claim for 'property damage.'" *See United States Fire Ins. Co.,* 979 So.2d at 889–90 (citing cases adopting this approach); *see also Wm. C. Vick Constr. Co. v. Pennsylvania Nat'l Mut. Cas. Ins. Co.,* 52 F.Supp.2d 569, 582 (E.D.N.C.1999) ("[T]he property allegedly damaged has to have been undamaged or uninjured at some previous point in time."), aff'd, 213 F.3d 634 (4th Cir.2000) (unpublished table decision); *L–J, Inc. v. Bituminous Fire & Marine Ins. Co.,* 366 S.C. 117, 124, 621 S.E.2d 33, 36 (2005) ("In the present case, the complaint did not allege property damage beyond the improper performance of the task itself."); *Travelers Indem. Co. of America,* 216 S.W.3d at 311 ("[W]e hold that claims alleging only damages for replacement of a defective component or correction of faulty installation do not allege 'property damage.'").

Further, we note it is only after "property damage" has been alleged that the question of "occurrence" is reached. With respect to the components of a project that sustained physical injury, we look to the definition of occurrence, which is ambiguous and must be construed in favor of the insured, and find coverage was triggered.

Returning to *Newman* and viewing those facts through the lens of both "property damage" and "occurrence," we clarify that the costs to replace the negligently constructed stucco did not constitute "property damage" under the terms of the policy. The stucco was not "injured." However, the damage to the remainder of the project caused by water penetration due to the negligently installed stucco did constitute "property damage." Based on those allegations of property damage and construing the ambiguous occurrence definition in favor of the insured, the insuring language of the policy in *Newman* was triggered by the property damage caused by repeated water

intrusion.[6]

▇ In sum, we clarify that negligent or defective construction resulting in damage to otherwise non-defective components may constitute "property damage," but the defective construction would not. We find the expanded definition of "occurrence" is ambiguous and must be construed in favor of the insured, and the facts of the instant case trigger the insuring language of Harleysville's policies. We note, however, that various exclusions may preclude coverage in some instances. Because the parties in the present case stipulated not to raise the issue, we do not address any policy exclusions and exceptions.

## IV.

▇ Harleysville next challenges the trial court's decision to impose "joint and several" [7] liability. We adopt the "time on risk" framework, and therefore overrule our decision in *Century Indemnity Co. v. Golden Hills Builders, Inc.*, 348 S.C. 559, 561 S.E.2d 355 (2002). In our view, the "time on risk" approach best conforms to the terms of a standard CGL policy and to the parties' objectively reasonable expectations. In particular, the "time on risk" approach requires a policyholder to bear a pro rata portion of the loss corresponding to any portion of the progressive damage period during which the policyholder was not insured or purchased insufficient insurance. The parties entered the following stipulations relevant to this issue:

8. The parties agree that the following matters are the only issues of law to be addressed by [the trial court]:

. . . .

---

6. In disposing of this appeal, we elect to adhere to our precedent in *Newman.* We do not address recent legislation that seeks in part to impose a construction on existing insurance policies in pending actions. *See* Act No. 26, 2011 S.C. Acts.

7. The term "joint and several" is a misnomer. While each insurer is fully responsible for indemnifying its policyholder, this result does not stem from any kind of shared duty to the policyholder as the term might suggest in a tort setting. Rather, the duties of each insurer are contractual in nature, and are defined by the terms of each policy. *Boston Gas Co. v. Century Indem. Co.*, 454 Mass. 337, 910 N.E.2d 290, 301 n. 24 (2009).

b. In the event the Court finds that there was an occurrence or occurrences, how shall the $7.2 million in insured damages referred to in paragraph 1 above be allocated, whether by "joint and several" or by "time on the risk;"

c. In the event judgment is entered for Plaintiffs, and that the Court determines that "time on the risk" is the proper allocation method, what is the proper period over which the "time on the risk" should be calculated. All parties reserve their right to argue, from the applicable facts and law, the appropriate start date and end date for any pro rata time on the risk allocation period. Alternatively, in the event that judgment is entered for the Plaintiffs and the Court determines that "joint and several" is the proper allocation method, whether Harleysville or Cincinnati is entitled to any set-off under South Carolina law in light of Plaintiffs' settlement with other insurers and, if set-off is appropriate, the amount of any such setoff.

The trial court found the allocation issue was controlled by *Century Indemnity Co. v. Golden Hills Builders, Inc.*, 348 S.C. 559, 561 S.E.2d 355 (2002). The trial court determined that *Century Indemnity* mandated a "joint and several" approach and, therefore, ordered Harleysville to indemnify the full $7.2 million in stipulated damages. We reverse and remand for further proceedings.

An analysis of the proper method for allocating a loss among successive insurers must begin with the threshold question of what must happen in order to trigger the potential for coverage under a particular policy. *See Montrose Chemical Corp. of California v. Admiral Ins. Co.*, 10 Cal.4th 645, 42 Cal.Rptr.2d 324, 913 P.2d 878, 880 n. 2 (1995) (en banc) (explaining that "trigger of coverage" is a description of "what must take place within the policy's effective dates" in order for there to be a potential of coverage (emphasis omitted)). Only after determining *how* policies are triggered will it be possible to decide *which* policies were triggered by a progressive injury [8] and, correspondingly, *how much* of the loss caused by

---

8. A progressive injury is an injury that results from an event or set of conditions that occurs repeatedly or continuously over time, such as

the injury is covered by each. The threshold issue of the trigger of coverage was resolved in South Carolina by the case of *Joe Harden Builders, Inc. v. Aetna Casualty & Surety Co.,* 326 S.C. 231, 486 S.E.2d 89 (1997).

Following *Joe Harden,* we were confronted in *Century Indemnity* with a question regarding the scope of a triggered insurer's obligation to its insured. In *Century Indemnity,* only one policy was at issue, and we were asked to determine whether it would cover "only the amount of property damage that occurred during the policy period" or "*all* sums [the policyholder] becomes legally obligated to pay[,] if property damage occurs during the policy period." 348 S.C. at 564, 561 S.E.2d at 357 (emphasis in original). These two alternatives are a classic statement of the difference between a "time on risk" and a "joint and several" approach to allocating losses in progressive property damage cases. We determined that the policy must cover "damage that occurred during the policy period *and* . . . any continuing damage." *Id.,* 561 S.E.2d at 358 (emphasis in original). This result was consistent with the "joint and several" approach to allocation because it made one policy responsible for the entire loss caused by a progressive injury.

■ The question addressed in *Century Indemnity* was one which has caused much consternation among the courts of this country. Because *Century Indemnity* gave only a conclusory analysis to this complex issue and because it relied on an incorrect interpretation of *Joe Harden* in doing so, we over-rule *Century Indemnity* and confront the allocation issue anew. After a detailed review of the policy language and the relevant case law, we find that each triggered insurer must indemnify only for the portion of the loss attributable to property damage that occurred during its policy period. Accordingly, we adopt a "time on risk" approach to the allocation of damages caused by progressive injuries.

### A. Harleysville's CGL Policies

We begin with the basic principle that insurance policies are contracts to be interpreted in accord with contract law. Ac-

---

long-term exposure to asbestos fibers or the continual intrusion of water into a building.

cordingly, our discussion begins with the language of the policies themselves. Harleysville's CGL policies provided, in relevant part, that they would cover "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." The insurance applied "only if: (1) The 'bodily injury' or 'property damage' [was] caused by an 'occurrence' ...; and (2) The 'bodily injury' or 'property damage' occur[red] during the policy period." [9]

This policy language, or language that is substantially the same, is typical of a standard CGL policy. Accordingly, the interpretation of Harleysville's policies would be controlled by *Joe Harden* and *Century Indemnity*. *See Century Indemnity Co.*, 348 S.C. at 561, 561 S.E.2d at 356 ("We accepted the following question[ ] certified by the United States Fourth Circuit Court of Appeals: 1. Does a standard commercial general liability insurance policy ... provide coverage for continuing damage that begins during the policy period?"); *Joe Harden Builders, Inc.*, 326 S.C. at 232, 486 S.E.2d at 89 ("This case is before us on certification from the United States District Court to interpret the language of a standard occurrence insurance policy."). We turn now to an analysis of those cases.

## B. *Joe Harden*

In *Joe Harden,* we were asked to answer the following certified question: "Where defective construction causes progressive property damage that is otherwise covered by insurance, is the property damage deemed to occur: 1. When the concrete frame is constructed out of plumb; 2. When the masonry contractor knowingly builds the defective brick wall; 3. When the failure of the brick wall is manifest; 4. When the owner actually discovers the failure of the brick wall; or 5. At some other time?" 326 S.C. at 232–33, 486 S.E.2d at 89–90. Clearly, this question focused on what must happen in order to trigger coverage under a particular policy. We surveyed four common theories.

---

9. Some of Harleysville's policies used slightly different wording to define when the insurance applied, but the differences were non-substantive.

First, we looked to the theory that coverage is triggered at the time of the "injury-causing event." We explained that, "[u]nder this theory, coverage is triggered at the time of the underlying injury-causing event, even though no damage has yet occurred, and the policy in effect at the time of this underlying event covers all the ensuing damage." *Id.* at 234, 486 S.E.2d at 90. The final phrase of this explanation—"covers all the ensuing damage"—is the logical result of the theory itself. If coverage results from the injury-causing event, and there is only one event, responsibility for full coverage would rest with a single policy. Coverage responsibility could only be spread among multiple policies if the court considered the "underlying event" to have been ongoing or repetitive, such that it spanned multiple policy periods.

The next theory we considered was that coverage is triggered "when [the] injury manifested." We said, "[u]nder this theory, damage is deemed to occur at the time it is manifested or discovered, thus triggering coverage for all the ensuing damage under the policy in effect at the time of manifestation, even if some damage actually occurred earlier but was undetected." *Id.* Like the first theory, the logical result here would be to place full responsibility on a single policy, unless the manifestation of an injury could somehow be construed as ongoing or repetitive.

The third theory—which we ultimately adopted—was different from the first two. We explained:

> Under this [third] theory, coverage may be triggered at any point from the time of the underlying injury-causing event until the damage is complete, **allowing coverage under any policy in effect during this entire time.** Some courts have adopted this theory to give effect to the language in the standard occurrence policy which provides coverage for a "continuous or repeated exposure to conditions."

*Id.* at 235, 486 S.E.2d at 91 (emphasis added). What makes this theory unique versus the first two is that it is logically consistent with indemnity under multiple policies: it "allow[s] coverage under any policy in effect during th[e] entire" progression of the damage. Notably missing from our explana-

tion, then, was the mention of any one policy covering "all ensuing damage."

Though we adopted this continuous trigger theory, thereby allowing coverage under *multiple* policies, we expressed disapproval regarding the aspect of the theory that allowed coverage under policies that *preceded* the first actual injury:

> We find this trigger gives effect to the policy provision regarding a continuous or repeated exposure **but that it suffers from the same problem as the first theory** discussed above **because it triggers coverage** from the time of the injury-causing event **even if no damage has yet occurred.** Again, such an interpretation conflicts with the plain language of the policy which provides that damage must occur during the policy period. **Accordingly, we adopt a continuous trigger theory but modify** it as discussed below.

*Id.* at 236, 486 S.E.2d at 91 (emphasis added). For that reason, we adopted what we called a "modified" continuous trigger. The modification was that, rather than defining the damage period as beginning with the injury-causing event and ending with manifestation, we defined the damage period as the term during which actual injuries occurred.

Before we made this modification, however, we described the fourth general theory regarding the trigger of coverage— that coverage is triggered "at the time of an injury-in-fact"— as follows: "Under this theory, coverage is triggered whenever the damage can be shown in fact **to have first occurred,** even if it is before the damage became apparent, and the policy in effect at the time of the injury-in-fact covers all the ensuing damages." *Id.* (emphasis added). Like the first two theories we discussed and rejected, this theory is logically consistent with indemnity only by a *single* policy: an injury can only have "first occurred" on a single occasion. *See Montrose Chemical Corp.*, 42 Cal.Rptr.2d 324, 913 P.2d at 895 n. 17 (noting an insurer's argument that "once an injury-in-fact is established, even retrospectively, all potential coverage is cut off . . . and only the insurer on the risk at the time the injury-in-fact first 'occurs' is liable to indemnify the insured").

In order to make an injury-in-fact trigger consistent with coverage under multiple policies, we had to recognize the

ongoing or repetitive nature of the injuries in a progressive damage case. We did precisely that by (a) adopting the continuous trigger theory (theory three), and (b) modifying it to require an injury-in-fact during each policy period. Thus, we stated:

> Because we find the injury-in-fact trigger consistent with the policy's requirement that damage occur during the policy period, **we adopt it in conjunction with a continuous trigger of coverage.** *See U.S. Gypsum Co. v. Admiral Ins. Co.,* 268 Ill.App.3d 598, 205 Ill.Dec. 619, 643 N.E.2d 1226 (1994) (injury-in-fact trigger and continuous trigger are on the same continuum and are complementary); *Industrial Steel Container Co. v. Fireman's Fund Ins. Co.,* 399 N.W.2d 156 (Minn.Ct.App.1987) (rejecting argument that there can be only one occurrence in continuous injury case and applying actual injury rule).

326 S.C. at 236, 486 S.E.2d at 91 (emphasis added). The *Industrial Steel Container Co.* case we cited in support explains that where a court considers there to have been ongoing injuries-in-fact, there is the potential for coverage under more than one policy. 399 N.W.2d at 159 ("We view this 'actual injury' rule to be sufficiently broad to recognize that in cases involving long exposure to a toxic substance there can be damage with more than one manifestation and more than one insurance policy can afford coverage. We reject the argument that there can be only one occurrence in a case where property damage results from continuous or repeated conditions of exposure.").

Our holding in *Joe Harden* was this: "We hold coverage is triggered at the time of an injury-in-fact and continuously thereafter to allow coverage under all policies in effect from the time of injury-in-fact during the progressive damage." 326 S.C. at 236, 486 S.E.2d at 91. This statement was a complete answer to the certified question before the Court. Unlike theories one, two, and four—which contemplated that a single policy would cover "all ensuing damage"—theory three included no statement as to the scope of coverage that would be provided by each triggered policy. Thus, the holding in *Joe Harden* did not answer the allocation question with which we are now presented.

Yet the *Joe Harden* Court then went one step further, making a statement in dictum that has been the source of much confusion. We said: "[T]his theory of coverage will allow the allocation of risk among insurers when more than one insurance policy is in effect during the progressive damage." *Id.* at 237, 486 S.E.2d at 91. This statement could be taken as a mere summation of the fact that theory three allows coverage under multiple policies. Nevertheless, it may be mistakenly construed to mean that (1) risk can *only* be allocated among insurers, and no portion of the risk can be borne by policyholders who allow insurance to lapse during some portion of the damage period; and (2) where there is only one insurance policy in effect during the progressive damage, that policy must bear the full risk. We attribute no such weighty meaning to this dictum.

We turn now to *Century Indemnity*, in which we were squarely presented with a question as to *how much* coverage each triggered insurer must provide.

## C. *Century Indemnity*

In *Century Indemnity*, we accepted the following certified question:

Does a standard commercial general liability insurance policy that explicitly provides coverage only for property damage occurring during the policy period provide coverage for continuing damage that begins during the policy period?

348 S.C. at 561, 561 S.E.2d at 356. In *Century Indemnity*, the policyholder purchased coverage from December 7, 1989, to December 7, 1990. The parties stipulated that moisture began to cause property damage prior to the end of the policy period, and that the damage was "continuous since that time." *Id.* at 562, 561 S.E.2d at 356. The CGL policy at issue was identical in all relevant respects to the policies in this case. *Id.* at 563, 561 S.E.2d at 357. We reasoned:

The issue is whether the policy should cover (1) only the amount of property damage that occurred during the policy period, *i.e.*, between December 7, 1989, and December 7, 1990; or (2) *all* sums Insured becomes legally obligated to pay if property damage occurs during the policy period.

We believe this issue can be resolved solely by reference to *Joe Harden Builders, Inc. v. Aetna Cas. & Sur. Co.*, 326 S.C. 231, 486 S.E.2d 89 (1997). In Joe Harden, the Court adopted a modified continuous trigger theory for determining when coverage is triggered under a standard occurrence policy. "Under this theory, coverage is triggered whenever the damage can be shown in fact to have first occurred, even if it is before the damage became apparent, and the policy in effect at the time of the injury-in-fact covers all the ensuing damages." *Id.* at 236, 486 S.E.2d at 91. Coverage is also triggered under every policy applicable thereafter.

Because the policy at issue here contains substantially the same language as the policy at issue in *Joe Harden*, the modified continuous trigger theory applies in the instant case. As a result, the insurance policy provides coverage for property damage that occurred during the policy period *and* for any continuing damage.

*Id.* at 564, 561 S.E.2d at 357–58 (emphasis in original).

This analysis fundamentally misinterpreted *Joe Harden* and is profoundly at odds with the insurance contract. The *Joe Harden* language relied upon in *Century Indemnity* was taken from the description of theory four, treating theory four as if it was the holding in *Joe Harden*. The actual holding in *Joe Harden*, adopting theory three and then modifying it using the injury-in-fact trigger from theory four, was that "coverage is triggered at the time of an injury-in-fact and continuously thereafter **to allow coverage under all policies** in effect from the time of injury-in-fact during the progressive damage." 326 S.C. at 236, 486 S.E.2d at 91 (emphasis added). The fundamental difference is this: while the theory quoted in *Century Indemnity* would make a single policy responsible for full indemnity, the modified continuous trigger theory adopted in *Joe Harden* makes multiple policies responsible.

The error in *Century Indemnity* is further evident in its statement that "property damage **relates back in time** to the time of the occurrence, that is, when the first injury occurred to the property." 348 S.C. at 563, 561 S.E.2d at 357 (emphasis added). Again, a "first injury" can only occur once. Thus, *Century Indemnity* would collapse all property damage into a single policy period. This would leave no logical basis for

finding that later policies were also triggered. *Joe Harden,* on the other hand, expressly contemplated that property damage would span multiple policy periods, triggering coverage under each policy.

In sum, the actual holding in *Joe Harden* gave no guidance as to how much coverage would be provided by each triggered policy. Because *Century Indemnity* relied on a single trigger theory, rather than on the modified continuous trigger theory adopted in *Joe Harden,* the *Century Indemnity* opinion gave short shrift to this complex issue. For this reason, we overrule *Century Indemnity* and confront the issue anew. We turn now to an analysis of the two theories regarding the scope of coverage advocated by the parties in this case.

### D. "Joint and Several" vs. Pro Rata/"Time on Risk"

In this case, Crossmann argues in favor of a "joint and several" approach to the allocation of damages, while Harleysville advocates a pro rata/"time on risk" approach. We adopt the pro rata/"time on risk" approach.

Courts adhering to the "joint and several" theory require each triggered insurer to indemnify its policyholder for the entire loss caused by the progressive injury, up to the policy limit, even if the majority of the loss occurred after the policy period expired. A key feature of this approach is that a policyholder may be indemnified in full despite its failure to purchase CGL coverage throughout the entire progressive damage period. Further, under this theory, where multiple insurance policies are triggered, the policyholder often is permitted to choose the policy from which it will seek indemnity. The chosen insurer may then seek partial reimbursement from any other insurers triggered by the progressive injury.[10]

---

**10.** In this way, an allocation *among insurers* based on each insurer's time on the risk can be consistent with a "joint and several" approach. In this context, "time on risk" is simply an equitable method of spreading the loss among several insurers, each of whom is liable *to the insured* for the loss in full. *See Sentinel Ins. Co. v. First Ins. Co. of Hawai'i,* 76 Hawai'i 277, 875 P.2d 894, 919 (1994) ("Equity, under the circumstances of this case, dictates that the court allocate contribution among the liable insurers in proportion to the time periods their policies covered."). As we will discuss, under the "time on the risk" theory of the scope of each insurer's obligation to its insured, each insurer's initial obligation to its insured is limited to a pro rata portion

Because "joint and several" jurisdictions typically allow a selected insurer to bring a separate lawsuit seeking such reimbursement, many have criticized the theory as inefficient and wasteful of judicial resources. *E.g., Boston Gas Co.,* 910 N.E.2d at 311.

The seminal case advocating a "joint and several" approach is *Keene Corporation v. Insurance Company of North America,* 667 F.2d 1034 (D.C.Cir.1981). *Keene* rested primarily on the view that a policyholder's purchase of insurance entitled it to certainty that it had limited its liability to the cost of the policy itself. *Id.* at 1047–48. Advocates of a "joint and several" approach typically contend that the plain language of the insuring agreement requires an insurer to pay "all sums" or "those sums" the insured becomes legally obligated to pay, as long as *some* property damage occurs during the policy period. *See, e.g., Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.,* 95 Ohio St.3d 512, 769 N.E.2d 835, 841 (2002).[11] As we detail below, we believe this interpretation ignores critical language limiting the insurer's obligation to pay to sums that are attributable to property damage that occurred during the policy period.

In contrast to the "joint and several" approach, courts adhering to a "pro rata" theory of the scope of each triggered insurer's obligation to its insured hold each insurer responsible only for some pro rata portion of the loss caused by a progressive injury, regardless of whether there are other triggered insurers available to cover the remainder. Thus, unlike jurisdictions using a "joint and several" theory, courts subscribing to a pro rata theory generally require the policyholder to bear the portion of the loss attributable to the policyholder's assumption of the risk. *Boston Gas Co.,* 910

___

of the loss. The loss could not then be redistributed among the insurers based on simple notions of equity.

**11.** The *Goodyear* Court explained its position as follows:

There is no language in the triggered policies that would serve to reduce an insurer's liability if an injury occurs only in part during a given policy period. The policies covered [the insured] for "all sums" incurred as damages for an injury to property occurring during the policy period. The plain language of this provision is inclusive of all damages resulting from a qualifying occurrence.

769 N.E.2d at 841.

N.E.2d at 303 ("One important feature of a pro rata allocation is that courts adopting this type of allocation generally require the policyholder to participate in the allocation ... for those periods of no insurance, self-insurance, or insufficient insurance." (alteration in original) (quoting J.M. Seaman & J.R. Schulze, *Allocation of Losses in Complex Insurance Coverage Claims* § 4:3[c], at 4–21 (2d ed.2008))). As a result, for those periods of "no insurance, self-insurance, or insufficient insurance" during the progressive damage period, a portion of the loss will be borne by the policyholder.

Pro rata theorists have developed several different methods for calculating each insurer's pro rata portion of the loss, each supported by its own notions of fairness and the nature of CGL insurance. "Time on risk" is one such method, and in our opinion, is the method most consistent with the language of a standard CGL policy.[12]

Our approach relies heavily on the opinion of the Supreme Judicial Court of Massachusetts in *Boston Gas Company v. Century Indemnity Company,* which provides the reading of the relevant policy language that we believe is correct:

> Once the policy is triggered ... the insuring agreement provides that [the insurer] will indemnify [the insured] only for the "ultimate net loss" that [the insured] is "legally obligated to pay [as damages] *'because of' ... 'property damage' ... 'to which this policy applies.'* " [The insurer]

---

**12.** Another common method is a "years and limits" allocation, whereby shares are determined by each insurer's proportion of the total available coverage. This is accomplished by dividing the sum of the insurer's policy limits by the sum of all policy limits purchased during the damage period. Thus, if insurer A issued two policies at $1 million each and insurer B issued four policies at $4 million each, the total available coverage would be $18 million, and insurer A would be responsible for 2/18 of the loss while insurer B would be responsible for 16/18 of the loss. In this way, a court applying a "years and limits" method attempts to allocate the loss in proportion to the amount of risk assumed by the insurer over the course of the damage period. *See, e.g., Carter–Wallace, Inc. v. Admiral Ins. Co.,* 154 N.J. 312, 712 A.2d 1116 (1998) (Part II); *Owens–Illinois, Inc. v. United Ins. Co.,* 138 N.J. 437, 650 A.2d 974 (1994) (Parts IV through VI). The effect of a "years and limits" allocation is to assign greater shares of the loss to insurers that offered higher policy limits. Because we believe the language of a standard CGL policy requires each insurer to bear only that portion of the loss attributable to damage that occurred during its policy period, we reject the "years and limits" approach.

then looks to the "Policy Period, Territory" provision as supplying a definition of the phrase "to which this policy applies." That provision states that "[t]his policy applies to ... *property damage* ... which occurs anywhere *during the policy period.*" [The insurer] concludes that the policy provides coverage only for [the insured's] liability resulting from property damage occurring during the policy period.

910 N.E.2d at 305 (emphasis in original); *id.* at 306–07 (adopting this interpretation of the policy language). This interpretation is consistent with various other courts around the country, including, among others, the Second and Sixth Circuit Courts of Appeal and the courts of Minnesota, New York, and Vermont. *Id.* at 307 n. 34 (citing cases).

While *Boston Gas* dealt with an excess insurance policy, rather than a standard CGL policy, the key language is the same. As in *Boston Gas,* Harleysville agreed to pay for damages incurred "because of 'bodily injury' or 'property damage' **to which this insurance applies.**" The insurance applies "**only if** ... [t]he 'bodily injury' or 'property damage' occur[red] during the policy period." In other words, the insurance **does not apply** to property damage that did not occur during the policy period. Though the insurer in *Boston Gas* agreed to pay the "ultimate net loss" above a certain threshold amount while a standard CGL policy promises payment for "those sums that the insured becomes legally obligated to pay as damages," both phrases are modified by the requirement that covered damages must be "**because of** ... 'property damage' to which th[e] insurance applies." This requirement limits the promise of payment, obligating the insurer to pay only those damages caused by property damage that "occurs during the policy period."

Not only does the *Boston Gas* interpretation give effect to each part of the insuring agreement (rather than focusing solely on the terms "all sums" or "those sums"), it is consistent with the objectively reasonable expectations of the contracting parties. As the *Boston Gas* Court explained:

[W]e doubt that an objectively reasonable insured reading the relevant policy language would expect coverage for liability from property damage occurring outside the policy period.... No reasonable policyholder could have expected

that a single one-year policy would cover all losses caused by [a progressive injury] over the course of several decades. Any reasonable insured purchasing a series of occurrence-based policies would have understood that each policy covered it only for property damage occurring during the policy year.

"[T]here is no logic to support the notion that one single insurance policy among 20 or 30 years worth of policies could be expected to be held liable for the entire time period. Nor is it reasonable to expect that a single-year policy would be liable, for example, if the insured carried no insurance at all for the other years covered by the occurrence."

910 N.E.2d at 309–10 (quoting *Public Service Co. of Colorado v. Wallis & Cos.*, 986 P.2d 924, 940 (Colo.1999) (en banc)).

Further, this interpretation forwards important policy goals. Specifically, it preserves the incentive for businesses to purchase sufficient insurance, which in turn promotes stability in the marketplace. *See id.* at 311 ("[T]he pro rata allocation method ... engenders stability and predictability in the insurance market, provides incentive for responsible commercial behavior, and produces an equitable result."). By contrast, the "joint and several" theory "creates a false equivalence between an insured who has purchased insurance coverage continuously for many years and an insured who has purchased only one year of insurance coverage." *Id.* (quoting *Public Serv. Co. of Colo.*, 986 P.2d at 939–940).

■ For these reasons, we reverse the trial court's order allocating the entire $7.2 million in stipulated damages to Harleysville and hold that the proper method for allocating damages in a progressive property damage case is to assign each triggered insurer a pro rata portion of the loss based on that insurer's time on the risk.[13] We remand for further proceedings consistent with a "time on risk" approach. To aid

---

**13.** The parties have also raised the issue of whether Harleysville is entitled to any set-off against the amounts already paid by other insurers. The parties have couched this as an alternative argument, applicable only if the Court chooses to follow a "joint and several" approach to allocation. Given our disposition, we need not reach the set-off issue.

the trial court in applying the "time on risk" framework, we provide guidance in the section below.

### E. Application of the "Time on Risk" Approach

An ideal application of the "time on risk" approach would require the finder of fact to determine precisely how much of the injury-in-fact occurred during each policy period and precisely what quantum of the damage award in the underlying suit was attributable to *that* injury. Unfortunately, it is often "both scientifically and administratively impossible" to make such determinations. *Boston Gas Co.,* 910 N.E.2d at 301 (quoting Michael G. Doherty, Comment, *Allocating Progressive Injury Liability Among Successive Insurance Policies,* 64 U. Chi. L.Rev. 257, 257–58 (1997)). This unique difficulty has been described as follows:

> "Most liability policies are designed to respond to losses, such as automobile accidents, which occur instantaneously. Losses of this nature are relatively easy to identify because damages are both immediate and finite, and can be measured quite simply against the limits of the policy or policies in effect on the date of the accident.
>
> On the other hand, losses where damage develops unrecognized over an extended period of time, such as bodily injury claims for toxic exposures and property damage claims for environmental contamination, are more difficult to pinpoint both in time and in degree. In these cases, correlating degrees of damage to particular points along the loss timeline may be virtually impossible. This has led to substantial uncertainty as to how responsibility for such losses should be allocated where multiple insurers have issued successive policies to the insured over the period of time the damage was developing."

*Id.* at 300 n. 20 (quoting William R. Hickman & Mary R. DeYoung, *Allocation of Environmental Cleanup Liability Between Successive Insurers,* 17 N. Ky. L.Rev. 291, 292 (1990)).

 In cases where it is impossible to know the exact measure of damages attributable to the injury that triggered each policy, courts have looked to the total loss incurred as a result of all of the property damage and then devised a formula to divide that loss in a manner that reasonably

approximates the loss attributable to each policy period. The basic formula consists of a numerator representing the number of years an insurer provided coverage and a denominator representing the total number of years during which the damage progressed.[14] This fraction is multiplied by the total amount the policyholder has become liable to pay as damages for the entire progressive injury. In this way, each triggered insurer is responsible for a share of the total loss that is proportionate to its time on the risk.[15]

This formula is not a perfect estimate of the loss attributable to each insurer's time on the risk. Rather, it is a *default rule* that assumes the damage occurred in equal portions during each year that it progressed. If proof is available showing that the damage progressed in some different way, then the allocation of losses would need to conform to that proof. However, absent such proof, assuming an even progression is a logical default.

In this case, a strict application of the basic "time on risk" formula might be inappropriate. There were numerous buildings involved in the underlying lawsuit against Crossmann, each with its own certificate of occupancy, and the parties have stipulated that the damage began "within 30 days after the Certificate of Occupancy was issued for each building." Further, the parties stipulated that the damage "progressed until repaired or until Beazer Homes paid to settle the underlying cases, whichever came first." Accordingly, it may be that, as to each building, each policy was "on the risk" for a

---

14. By making the denominator the total number of years during which the damage progressed, a policyholder who chose not to purchase coverage for certain years will be left with the responsibility for whatever portion of the total loss is attributed to those uninsured years.

15. Because this formula allocates the total loss caused by a progressive injury in equal shares across all policy periods, there might arise a situation in which the portion of the loss attributed to a particular policy exceeds that policy's limit of coverage. The portion of the loss that exceeds the policy limit would either fall back onto the policyholder or be covered by an excess insurance policy. This result is equitable and in line with the policyholder's objectively reasonable expectations: the policyholder could only have expected each policy to indemnify up to its limit of coverage and, as we have explained above, should have expected that each policy would cover only the damage that occurred during its policy period.

slightly different proportion of the total damage period. We leave it to the sound discretion of the trial court to determine whether it is necessary to apply the "time on risk" formula separately to each individual building or whether, instead, it would be prudent to modify the default formula to arrive at a reasonable methodology for this case. Thus, we emphasize that trial courts employing the "time on risk" approach may alter the default formula set forth above where a strict application would be unduly burdensome or otherwise inappropriate under the circumstances of a particular case. However, any such alterations must remain within the bounds of a pro rata/"time on risk" approach: the formula must result in a reasonable approximation of the amount of property damage that occurred during each insurer's policy period.[16]

In sum, we construe the standard CGL policy to require that each insurer cover only that portion of a loss attributable to property damage that occurred during its policy period. In light of the difficulty in proving the exact amount of damage incurred during each policy period, we adopt the formula above as the default method for allocating shares of the loss. Trial courts may vary from this default formula where appropriate to the circumstances of a particular case, but they must remain faithful to the premise that each insurer is responsible only for a pro rata portion of the total loss, and each pro rata portion must be defined by the insurer's time on the risk.

## CONCLUSION

We affirm the trial court's finding that coverage was triggered by an "occurrence." We overrule *Century Indemnity* and impose a "time on risk" approach to defining the scope of each CGL insurer's obligation to its insured in a progressive

---

16. Some courts have created an "unavailability" exception to the "time on risk" rule and therefore altered the default formula to exclude years during which coverage was either not offered by the insurance industry or not offered to the particular policyholder. *See Boston Gas Co.,* 910 N.E.2d at 315 & n. 41 (citing cases). Alterations of this kind would exceed the trial court's authority, as the effect is to shift losses from one policy period to another in order to create coverage where none was purchased. As observed in *Boston Gas,* an unavailability exception "effectively provides insurance where insurers made the calculated decision **not** to assume risk and not to accept premiums." *Id.* at 315 (emphasis added).

damage case. This equitable approach best harmonizes with policy language limiting coverage to the "policy period." Moreover, the "time on risk" framework lends itself to a logical default formula that is easily applied when the actual quantum of damage incurred during each policy period is not known. We remand to the trial court for further proceedings consistent with this opinion.[17]

**AFFIRMED IN PART, REVERSED IN PART AND REMANDED.**

TOAL, C.J., PLEICONES, BEATTY and HEARN, JJ., concur.

────────────

17. Crossmann has cross-appealed from the denial of its request for prejudgment interest. We affirm the trial court's denial of prejudgment interest pursuant to Rule 220(b)(1), SCACR. *See Great Games, Inc. v. South Carolina Dep't of Revenue*, 339 S.C. 79, 85, 529 S.E.2d 6, 9 (2000) (stating that where the trial court fails to address a nonprevailing party's argument, and the party fails to bring the omission to the court's attention in a Rule 59, SCRCP, motion, the argument is not preserved for review).