**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

―――――――――

**No. 25-1408**

―――――――――

METALDYNE POWERTRAIN COMPONENTS, INC.,

> Plaintiff – Appellee,

v.

SANSERA ENGINEERING LTD.,

> Defendant – Appellant.

―――――――――

Appeal from the United States District Court for the District of South Carolina, at Charleston. Bruce H. Hendricks, District Judge. (2:21-cv-03588-BHH)

―――――――――

Argued: October 21, 2025                    Decided:  December 29, 2025

―――――――――

Before HARRIS, HEYTENS, and BENJAMIN, Circuit Judges.

―――――――――

Vacated and remanded by unpublished opinion. Judge Heytens wrote the opinion, which Judge Harris and Judge Benjamin joined.

―――――――――

**ARGUED:** Herbert C. Donovan, BROOKS WILKINS SHARKEY & TURCO PLLC, Birmingham, Michigan, for Appellant. Kevin Alan Hall, WOMBLE BOND DICKINSON (US) LLP, Columbia, South Carolina, for Appellee. **ON BRIEF:** Robert E. Sumner, IV, BUTLER SNOW, LLP, Charleston, South Carolina; Jason D. Killips, BROOKS WILKINS SHARKEY & TURCO PLLC, Birmingham, Michigan, for Appellant. M. Todd Carroll, Ruth A. Levy, Columbia, South Carolina, M. Elizabeth O'Neill, WOMBLE BOND DICKINSON (US) LLP, Charlotte, North Carolina, for Appellee.

―――――――――

Unpublished opinions are not binding precedent in this circuit.

USCA4 Appeal: 25-1408    Doc: 45        Filed: 12/29/2025    Pg: 2 of 8

2

TOBY HEYTENS, Circuit Judge:

This appeal turns on whether a particular contractual provision governs a given set of claims. Because the district court erred in concluding that provision applies here, we vacate the judgment and remand for further proceedings.

I.

Plaintiff Metaldyne Powertrain Components, Inc. supplies transmission gearboxes for BMW motorcycles. In 2016, Metaldyne bought a component of those gearboxes from defendant Sansera Engineering Ltd. A few years later, BMW voluntarily recalled and replaced the Sansera-supplied parts after reports of defects and reached a settlement with Metaldyne to recoup the costs of doing so.

Metaldyne sued Sansera on six state-law theories, seeking indemnification "for the costs and amounts it was obligated to pay BMW." JA 22.[1] The district court granted summary judgment to Sansera on all six counts. Metaldyne appeals. As always, we review a district court's grant of summary judgment de novo, see, *e.g.*, *Hall v. Sheppard Pratt Health Sys.*, 155 F.4th 747, 751 (4th Cir. 2025), including the court's interpretation of state law, see *Salve Regina Coll. v. Russell*, 499 U.S. 225, 231 (1991).

II.

The district court's reasons for rejecting each of Metaldyne's claims rest on a shared foundation—that Section 9 of the underlying purchase order between Sansera and

---

[1] Sansera also brought counterclaims against Metaldyne. The district court granted summary judgment to Metaldyne on those claims, and Sansera has not cross-appealed that portion of the court's judgment.

Metaldyne applies to this dispute. Building on that foundation, the district court concluded that: (1) Metaldyne has no claim under Section 9 because it did not obtain Sansera's "prior written consent" before settling with BMW, JA 46; and (2) Section 9 provides the exclusive mechanism for Metaldyne's requested relief, so all Metaldyne's claims fail as a matter of law. Because we conclude the initial premise is faulty—*i.e.*, that Section 9 does not apply here—we vacate the district court's judgment and remand for further proceedings without reaching any other questions.

The parties agree South Carolina law governs their dispute, and we decide the case based on that understanding. In South Carolina, "[t]he cardinal rule of contract interpretation is to ascertain and give legal effect to the parties' intentions as determined by the contract language." *Whitlock v. Stewart Title Guar. Co.*, 732 S.E.2d 626, 628 (S.C. 2012) (quotation marks removed). In doing so, we must "examin[e] the entire contract" rather than "portions" in "isolat[ion]." *Williams v. GEICO*, 762 S.E.2d 705, 710 (S.C. 2014). Applying those rules, we conclude Section 9 does not apply in this situation.

Section 9's text is a poor fit for these facts. Its first sentence requires Sansera to "indemnify and defend [Metaldyne] against third-party claims asserted against [Metaldyne] or its customers for bodily injury, death, or property damage[.]" JA 45–46. That language alone creates two problems for Sansera's position.

First, Metaldyne is not seeking indemnification for amounts it paid "for bodily injury, death, or property damage." JA 45–46. Instead, Metaldyne asserts—without contradiction from Sansera—that it seeks to recover money it paid to reimburse BMW for the cost of recalling and replacing Sansera-supplied parts *before* those parts broke. And

4

under South Carolina law, there is a "difference between a claim for the costs of repairing or removing defective work, *which is not a claim for property damage*, and a claim for the costs of repairing damage caused by the defective work, which is a claim for property damage." *Crossmann Cmtys. of N.C., Inc. v. Harleysville Mut. Ins. Co.*, 717 S.E.2d 589, 593 (S.C. 2011) (quotation marks removed and emphasis added).

Second, under South Carolina law, BMW's claims against Metaldyne were not "third-party claims asserted against [Metaldyne] or its customers." JA 45. Although the district court was right that "BMW is a third-party to" the contract between Metaldyne and Sansera (JA 309), BMW did not assert a "third-party claim[]" against Metaldyne within the meaning of Section 9. Section 9 is captioned "Product Liability," which tracks its use of words like "design or manufacture of Products," "defect[s]," and liability for "bodily injury, death, or property damage." JA 45–46. And, under South Carolina law, the "[l]iability of [a] seller for [a] defective product" is based on "physical harm caused to *the ultimate user or consumer, or to his property*," S.C. Code § 15-73-10(1) (emphasis added), not economic harm to downstream suppliers like BMW. So, here too, Section 9 does not appear to cover the claims for which Metaldyne seeks indemnification.

Two more features of the Metaldyne–Sansera contract confirm our conclusion. For one thing, Section 9's final paragraph requires Sansera to "obtain product liability insurance with worldwide validity and a minimum coverage in the amount of $20 million per occurrence for personal injury and property damage or other amount agreed to in writing by [Metaldyne]." JA 46. The obvious purpose of this provision is to ensure Sansera's ability to meet the indemnification obligations imposed by Section 9's first

5

sentence. But if Sansera's view were right, that scheme would have a serious gap because—as we have explained—it does not appear that a "product liability insurance policy" would cover the sort of costs BMW sought from Metaldyne here.

Finally, a different provision of the Metaldyne–Sansera agreement—Section 14—specifically distinguishes between the circumstances covered by Section 9 and those present here. Section 14 specifies four types of "costs [] and losses" for which Sansera must reimburse Metaldyne if any Sansera-supplied parts fail to comply with the warranties set forth elsewhere in the contract. JA 52. One provision mirrors Section 9 by referencing "claims for personal injury (including death) or property damage caused by such nonconforming Products." *Id.*; accord JA 45–46 (Section 9 covers "claims . . . for bodily injury, death, or property damage . . . caused by [Sansera's] design or manufacture of Products or provision of Services"). In contrast, a different provision identifies costs and expenses incurred in "conducting recall campaigns or other corrective service actions." JA 52. If "property damage" (a term used in both Section 9 and Section 14) already included recall costs, there would have been no need to list "recall costs" separately in Section 14.[2]

---

[2] Sansera insists that Section 14's recall language "is irrelevant here" because that section is limited to "costs, expenses and losses incurred by [Metaldyne]" rather than BMW. Sansera Br. 28–30; see JA 52. We need not and do not decide at this point whether Metaldyne has a valid claim under Section 14. For our purposes, it is enough to say that Section 14 confirms that the contract's drafters knew how to distinguish claims for indemnification arising from property damage from those arising from recalls.

Sansera's contrary arguments fail to move the needle. It cites two district court opinions for the proposition that "an ultimate manufacturer's recall of a product resulting from a supplier's faulty inputs falls within the phrase 'property damage.'" Sansera Br. 18. Neither decision involved South Carolina law and neither is binding on us. What is more— and unlike in this case—the "faulty inputs" (*id.*) in those cases irreparably damaged the broader products, which fell within those contracts' definitions of "property damage." *Penn Nat'l Sec. Ins. Co. v. LinkOne SRC, LLC*, 542 F. Supp. 3d 355, 363 (E.D.N.C. 2021) (quoting definition); *Thruway Produce, Inc. v. Massachusetts Bay Ins. Co.*, 114 F. Supp. 3d 81, 94 (W.D.N.Y. 2015) (same). In contrast, the contract at issue here does not define property damage. And, as we explained earlier, the default rule in South Carolina is that "the costs of repairing or removing defective work"—the situation we have here—"*is not a claim for property damage.*" *Crossmann Cmtys. of N.C.*, 717 S.E.2d at 593 (quotation marks removed and emphasis added).

Sansera also points to "the breadth of the Metaldyne–BMW settlement agreement," contending that it "covers every conceivable claim BMW could have asserted against Metaldyne arising from the defective gearboxes"—including any potential tort claims brought by consumers against BMW. Sansera Br. 16. But the question before us involves the nature of the claims for which Metaldyne is seeking recovery from Sansera rather than the scope of the claims BMW gave up against Metaldyne. And, once again, Sansera has not challenged Metaldyne's assertions that the amount it seeks in this case is the exact amount it paid to reimburse BMW for its recall costs.

\*      \*      \*

7

We need not and do not address whether another section of the contract governs Metaldyne's claims or whether some or all of Metaldyne's claims fail for other reasons. Instead, we hold only that the district court erred in concluding that Section 9 governs these claims. The judgment is vacated, and the case is remanded for further proceedings consistent with this opinion.

*SO ORDERED*