# IN THE SUPREME COURT OF TEXAS

══════════
No. 11-0394
══════════

LENNAR CORPORATION, LENNAR HOMES OF TEXAS
SALES & MARKETING LTD., AND LENNAR HOMES OF TEXAS
LAND & CONSTRUCTION LTD., PETITIONERS,

v.

MARKEL AMERICAN INSURANCE COMPANY, RESPONDENT

══════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTEENTH DISTRICT OF TEXAS
══════════════════════════════════════════════════

**Argued October 16, 2012**

JUSTICE HECHT delivered the opinion of the Court, in which CHIEF JUSTICE JEFFERSON, JUSTICE GREEN, JUSTICE JOHNSON, JUSTICE WILLETT, JUSTICE GUZMAN, JUSTICE LEHRMANN, and JUSTICE DEVINE joined.

JUSTICE BOYD filed a concurring opinion.

Having determined that homes built with an exterior insulation and finish system ("EIFS") suffer serious water damage that worsens over time, a homebuilder undertook to remove the product from all the homes it had built and replace it with conventional stucco. The homebuilder's insurers refused to cooperate with this remediation program, preferring instead to wait until homeowners sued, and denied coverage of the costs. This litigation, lasting more than twelve years, ensued. Now, only one insurer remains, and the issues have been winnowed to two:

- Not having consented to the homebuilder's remediation program, is the insurer nevertheless responsible for the costs if it suffered no prejudice as a result?

- Is the insurer responsible for (i) costs incurred to determine property damage as well as to repair it, and (ii) costs to remediate damage that began before and continued after the policy period?

We resolve these issues in the homebuilder's favor, reverse the judgment of the court of appeals,[1] and reinstate the judgment of the trial court.

## I

Long used in commercial construction, EIFS was marketed in the early 1990s as an attractive alternative to conventional stucco in home construction. But installed on wood-frame walls typical of single-family homes, EIFS traps water inside, causing rot and structural damage, mildew and mold, and termite infestations.[2] Damage is often undetectable from a visual inspection of the exterior of the home. Lennar Corporation and another homebuilder it bought[3] built some 800 homes using EIFS, but stopped using it in 1998. After the problems with EIFS were exposed on the NBC television show *Dateline* in 1999, homeowner complaints poured in. Lennar investigated and learned that the problems associated with EIFS were frequent and substantial. Property damage typically began six to twelve months after EIFS was installed, progressed more or less, depending

---

[1] 342 S.W.3d 704 [*Lennar II*], following remand in *Lennar Corp. v. Great Am. Ins. Co.*, 200 S.W.3d 651 (Tex. App.–Houston [14th Dist.] 2006, no pet.) [*Lennar I*].

[2] The problems with using EIFS in home construction have become familiar to us. *See Fresh Coat, Inc. v. K-2, Inc.*, 318 S.W.3d 893 (Tex. 2010); *Pine Oak Builders, Inc. v. Great Am. Lloyds Ins. Co.*, 279 S.W.3d 650 (Tex. 2009); *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20 (Tex. 2008).

[3] Petitioners are Lennar Corporation and two subsidiaries, Lennar Homes of Texas Sales & Marketing Ltd. and Lennar Homes of Texas Land & Construction Ltd. Lennar Corporation bought Village Builders in 1996. All are collectively referred to as "Lennar".

on the proximity of water due to rain and yard irrigation, and continued until the EIFS was removed. Lennar decided not merely to address complaints as it received them but to contact all its homeowners and offer to remove the EIFS and replace it with conventional stucco. Lennar began its remediation program in 1999 and finished in 2003. Almost all the homeowners accepted Lennar's offer of remediation. A few were paid cash.[4] Only three ever sued.[5] All settled.[6]

Early in the process, Lennar notified its insurers that it would seek indemnification for the costs. The insurers refused to participate in Lennar's proactive, comprehensive efforts, preferring instead to wait and respond to homeowners' claims one by one. All the insurers denied coverage, and in 2000, Lennar sued. The trial court granted summary judgments for the insurers, and the court of appeals affirmed for all but two: American Dynasty Surplus Lines Insurance Company, which had provided Lennar a $1 million primary commercial general liability policy with an annual $1 million self-insured retention, and Markel American Insurance Company, which had provided a $25 million commercial umbrella policy, in effect from June 1, 1999 through October 19, 2000.[7] On remand, Lennar settled with American Dynasty, leaving only its claims against Markel for trial.

---

[4] *See Lennar I*, 200 S.W.3d at 661 n.4 ("Lennar paid cash settlements to a few homeowners").

[5] *Id.* at 661 n.3 ("Of the approximately 400 homes involved, only two homeowners filed suit against Lennar."). The record, however, contains references to three lawsuits.

[6] *Lennar II*, 342 S.W.3d at 714 ("It is undisputed that Lennar entered into a settlement agreement with each homeowner.").

[7] *Lennar I*, 200 S.W.3d at 685, 691, 704.

Among the many disputes the court of appeals resolved was whether Lennar's costs to remove and replace EIFS as a preventative measure were incurred "because of . . . property damage" and thus covered by the policies.[8] The court held they were not:

> Lennar arguably made a good business decision to remove and replace all the EIFS to prevent further damage. Nonetheless, . . . we cannot conclude that it was necessary for Lennar to remove and replace all the EIFS in order to repair the water damage, if any, to each home. Therefore, the costs incurred by Lennar to remove and replace EIFS as a preventative measure are not [covered]. Accordingly, Lennar must apportion the EIFS-related damages between its costs to remove and replace EIFS as a preventative measure and its costs to repair water damage to the homes.[9]

Lennar and Markel also disputed whether coverage was precluded by Lennar's failure to comply with Condition E of the policy, which states in part: "it is a requirement of this policy that . . . no insured, except at their own cost, voluntarily make any payment, assume any obligation, or incur any expense . . . without [Markel's] consent". Markel had not consented to Lennar's remediation settlements.[10] Citing our decision in *Hernandez v. Gulf Group Lloyds*,[11] the court held that Markel's liability was not excused unless it could prove, as a matter of fact, that it had been prejudiced by Lennar's settlements with homeowners.[12] Neither Lennar nor Markel sought review of the court of appeals' decision. Both have accepted that court's holdings as governing the case.

---

[8] *Id.* at 677.

[9] *Id.* at 679–680.

[10] *Id.* at 695 n.58.

[11] 875 S.W.2d 691, 692–694 (Tex. 1994).

[12] *Lennar I*, 200 S.W.3d at 695.

4

At trial against Markel, Lennar offered evidence that the extent of water damage to a home could not be determined without removing all the EIFS, though when that was done, some homes turned out to have only limited damage, and some had none at all. Lennar offered evidence of its remediation costs for only 465 homes that had some water damage, but it included costs for removing and replacing all the EIFS on the homes, even if only part of a home was damaged. Lennar offered no evidence of the costs of work done on a few homes that turned out to be completely undamaged. At Lennar's request, the trial court asked the jury to find for each home the amount "incurred in payment of property damage", defined as:

- The cost to remove and replace the EIFS in order to access and repair underlying water damage *or in order to determine the areas of underlying water damage.*

- The cost to repair any water damage to the home.

- The cost to repair broken windows, cracked driveways, landscaping, and other parts of the home that were damaged in the course of repairing water damage to the home.

(Emphasis added.) The court overruled Markel's objections that the italicized phrase did not describe a cost incurred "because of . . . property damage" under its policy and that Lennar had not segregated covered and uncovered costs as directed by the court of appeals.

After hearing evidence for eight days, the jury found that Lennar's defective use of EIFS in home construction "create[d] an imminent threat to the health or safety of the inhabitants of the homes", and that Lennar took "reasonable steps to cure the construction defect as soon as practicable and within a reasonable time". Lennar argued that these findings established its legal liability to the

homeowners under the Residential Construction Liability Act ("RCLA").[13] The jury failed to find that Markel was prejudiced by Lennar's "failure to obtain Markel's consent (a) to enter into any compromise settlement agreement, or (b) to voluntarily make any payment, assume any obligation, or incur any expense". The trial court rendered judgment awarding Lennar $2,965,114.16, the damages found by the jury less a $425,000 credit for settlements with other insurers, $2,421,825.89, the attorney fees found by the jury, and $1,227,476.03 in prejudgment interest.

The court of appeals reversed and rendered judgment for Markel on two grounds.[14] One was that Lennar had not established its legal liability to the homeowners to trigger Markel's coverage.[15] The court concluded that the RCLA did not make Lennar legally liable to the homeowners because it does not create a cause of action,[16] and that the policy did not allow Lennar to show legal liability to the homeowners using settlements to which Markel had not agreed.[17] Markel had also argued that it was prejudiced by Lennar's violation of the consent-to-settlement provision in Condition E, but the court reasoned that it did not need to address that issue given its disposition in the case.[18]

---

[13] TEX. PROP. CODE §§ 27.001–.007.

[14] *Lennar II*, 342 S.W.3d at 716.

[15] *Id.* at 712–16.

[16] *Id.* at 713–714; *see* TEX. PROP. CODE § 27.005 ("This chapter does not create a cause of action . . . ."). The court had not addressed this issue in the first appeal. *Lennar I*, 200 S.W.3d at 680 n.37 ("In their motions for summary judgment, several carriers argued that Lennar was not 'legally obligated to pay' the EIFS claims because it settled them voluntarily without suits being filed. According to Lennar, [RCLA] legally obligated Lennar to cure construction defects without suits being filed. On appeal, the carriers no longer argue that Lennar was not legally obligated to pay the EIFS claims." (Citation omitted.)).

[17] *Lennar II*, 342 S.W.3d at 714–716.

[18] *Id.* at 715 n.10. The court also rejected Lennar's argument that it was legally liable for using a defective product. *Id.* at 714.

The other ground for the court's decision was that Lennar had not offered evidence of damages covered by the policy. The court concluded that "[t]he removal and replacement of EIFS 'in order to determine the areas of underlying water damage' as defined in the charge includes merely removing and replacing EIFS as a preventative measure, whether there was property damage or not."[19] The court expressly did not address Markel's argument that Lennar had not offered evidence of damages occurring during its policy period as opposed to all the years during which Lennar was pursuing remediation.[20]

We granted Lennar's petition for review.[21] We consider first whether Lennar established its legal liability to the homeowners, then whether it properly proved the amount of its loss.

## II

As noted above, Condition E of Markel's policy forbade Lennar, "except at [its] own cost, [from] voluntarily mak[ing] any payment, assum[ing] any obligation, or incur[ring] any expense . . . without [Markel's] consent". Though Markel did not consent to Lennar's settlements with homeowners, it concedes, as *Lennar I* held,[22] that this provision does not excuse its liability under the policy unless it was prejudiced by the settlements. *Lennar I* relied on our decision in *Hernandez v. Gulf Group Lloyds*.[23] There, the parents of a girl killed in a car accident settled with the other

---

[19] *Id.* at 711.

[20] *Id.* at 712 n.5.

[21] 55 Tex. Sup. Ct. J. 755, 757 (June 11, 2012).

[22] 200 S.W.3d at 695.

[23] 875 S.W.2d 691 (Tex. 1994).

driver for his only asset, the limit of his auto insurance policy, which was far less than their damages, then claimed uninsured/underinsured motorist ("UM/UIM") coverage under their own auto policy.[24] Their insurer had not been asked to consent to the settlement and denied the claim based on a policy exclusion for "bodily injury . . . with respect to which the insured . . . shall, without written consent of the company, make any settlement with any person . . . who may be legally liable therefor".[25] The insureds argued that without a showing that their settlement had prejudiced the insured, they had been denied the UM/UIM protection required by statute.[26] We did not reach that argument, concluding instead that prejudice is required by principles of contract law.[27] Generally, one party's breach does not excuse the other's performance unless the breach is material.[28] One factor in determining materiality is "the extent to which the nonbreaching party will be deprived of the benefit that it could have reasonably anticipated from full performance."[29] The insurer had been deprived of only one benefit, its subrogation right against the other driver, and it stipulated that it had not, as a result, incurred any financial loss.[30] Thus, we concluded, the insureds' breach by settling without

[24] *Id.* at 692.

[25] *Id.*

[26] *Id.*

[27] *Id.* at 692–694.

[28] *Id.* at 692 ("A fundamental principle of contract law is that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from any obligation to perform."); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 237 (1981) (stating that with exceptions, "it is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time.").

[29] *Id.* at 693 (citing RESTATEMENT (SECOND) OF CONTRACTS § 241(a) (1981)).

[30] *Id.* at 693–694.

the insurer's consent was not material, the insurer was not prejudiced, and coverage was not excused.[31]

At trial, Markel vigorously contended that Lennar's settlements were prejudicial, largely because Lennar offered remediation to homeowners with damaged houses who would never have sought redress had Lennar left them alone. The jury did not find Markel's position convincing or conclude that Lennar's remediation program was anything other than a reasonable approach to a serious problem. The jury was entitled to credit evidence that, had Lennar not proceeded as it did, the damages would have worsened and the remediation costs increased. In this Court, Markel nevertheless asserts that it established prejudice as a matter of law. It argues in its brief:

> When an insurer is not asked to adjust a claim, provide a defense, or be involved in negotiating a settlement, but is simply told it has to pay for a voluntary payment, the insurer has suffered prejudice as a matter of law. That prejudice is even more stark in this case, in which the insured actively solicited claims which might otherwise never have been brought and made payments which were not covered under the Policy.[32]

Under *Hernandez*, an insurer establishes prejudice from a settlement to which it did not agree by showing that the insured's unilateral settlement was a material breach of the policy — that is, that it significantly impaired the insurer's position. Markel's argument boils down to this — had Lennar

---

[31] *Id.* Amicus curiae, the Complex Insurance Claims Litigation Association, argues that requiring prejudice before enforcing a consent-to-settlement provision simply rewrites the policy, that many jurisdictions impose no such requirement, and that *Hernandez* should be limited to UM/UIM policies. We answered the first argument in *Hernandez*: general contract law requires prejudice. *Id.* at 692. The second argument is also answered in *Hernandez*: jurisdictions differ, for various reasons, over the necessity of prejudice. *Id.* at 693 n.4 (listing cases). In response to the third, nothing in *Hernandez* suggests that its rationale is limited to the type of insurance coverage involved.

[32] Markel's Brief on the Merits 42–43.

stonewalled the homeowners, fewer repairs would have been made. On this record, that is a question of fact, not of law, which the jury resolved in Lennar's favor.

But Condition E's consent-to-settlement requirement also finds expression in the policy's Insuring Agreement, and Markel argues that it can insist on compliance with this separate provision without proving prejudice. The policy obligates Markel to pay Lennar's "ultimate net loss" — defined as "the total amount of [property] damages for which [Lennar] is legally liable"[33] — and states that such loss "may be established by adjudication, arbitration, or a compromise settlement to which we have previously agreed in writing." Markel contends that these three ways for establishing a covered loss are exclusive, and we assume, without deciding, that Markel is correct. Markel argues that this Loss Establishment Provision, unlike Condition E, is central to the policy because of its "unmistakeable language" and its purpose in preventing insureds from determining loss unilaterally, and therefore any breach is material. Lennar responds that the provision cannot operate differently than Condition E.

Assuming Markel is right, that an insurer need not show prejudice from an insured's failure to comply with a policy requirement that is "considered essential to coverage",[34] the Loss Establishment Provision does not qualify, certainly not for the reasons Markel argues. Its language is no clearer than Condition E's, and the purpose of the two provisions, precluding liability for the

---

[33] The obligation was, of course, subject to American Dynasty's $1 million primary coverage, Lennar's $1 million self-insured retention, and Markel's $25 million policy limits.

[34] *Prodigy Commc'ns Corp. v. Agric. Excess & Surplus Ins. Co.,* 288 S.W.3d 374, 381 (Tex. 2009) (citing as an example the requirement in a claims-made-and-reported policy that a claim be reported to the insurer during the policy period or within a specific number of days thereafter).

insured's voluntary payments without the insurer's consent, is exactly the same. The Loss Establishment Provision is no more central to the policy than Condition E, and the requirement that Markel show prejudice from Lennar's non-compliance with either operates identically. Markel failed to prove that it was prejudiced in any way by Lennar's settlements. To allow it to argue that Lennar cannot use those non-prejudicial settlements to establish the amount of its loss would plainly subvert the requirement that Markel show that Lennar's non-compliance was material. The jury's failure to find prejudice leaves but one conclusion: that Lennar's loss as shown by the settlements is the amount Markel is obligated to pay under the policy.[35]

Absent prejudice to Markel, Lennar's settlements with homeowners establish both its legal liability[36] for the property damages and the basis for determining the amount of loss.[37]

### III

We come now to the question whether the amount of damages found by the jury is covered by Markel's policy. The policy obligated Markel to pay "the total amount" of Lennar's loss "because of" property damage that "occurred during the policy period", including "continuous or repeated exposure to the same general harmful condition". Focusing on "because of", the court of appeals

---

[35] We do not, as the concurrence asserts, implicitly base our decision on public policy. "Generally, the State's public policy is reflected in its statutes." *Town of Flower Mound v. Stafford Estates Ltd. P'ship*, 135 S.W.3d 620, 628 (Tex. 2004) (internal quotation marks omitted). Our analysis is based on the same settled principles of contract law and textual interpretation of insurance policies on which we based our decision in *Hernandez*.

[36] Markel states in its brief that the settlement agreements did not "establish an obligation to pay anything; they commit Lennar to perform repairs." Markel's Brief on the Merits 33. The costs to perform that commitment are Lennar's legal liability.

[37] Having reached this conclusion, we need not consider Lennar's contention that its liability was also established by RCLA.

11

held that the policy covers only the cost of repairing home damage, not the cost of locating it, and because Lennar's evidence did not segregate the two, it was entitled to recover nothing.[38] Additionally, Markel argues that Lennar's evidence improperly included the cost of repairing home damage that occurred outside the policy period. The court of appeals did not reach this argument.[39] We examine each issue in turn.

## A

As we have explained, water damage from EIFS occurs within the walls of homes to which it is applied and thus is often hidden from sight. Lennar's evidence at trial was that the extent of damage to a home cannot be determined without removing all the EIFS. Accordingly, the only cost evidence Lennar presented was for removing all the EIFS from damaged houses, repairing the damage, and recovering the houses with conventional stucco. For a few homes, removal of the EIFS revealed no damage whatever, and Lennar did not offer any evidence of its remediation costs for those homes. But for the homes that had some damage, Lennar did not segregate its cost to repair only the damage found; it included the cost of removing EIFS from the entire house to find all the damaged areas. The jury was asked to find Lennar's costs of determining the areas of water damage as well as repairing them. Markel argues, and the court of appeals held, that the cost of determining the areas of water damage is not covered by the policy.

---

[38] *Lennar II*, 342 S.W.3d at 711.

[39] *Id.* at 712 n.5.

We have noted that the phrase, "because of", used in determining a covered loss under a commercial general liability policy, "is susceptible to a broad definition."[40] But it need not be read broadly to reach all of Lennar's remediation costs. Under no reasonable construction of the phrase can the cost of finding EIFS property damage in order to repair it not be considered to be "because of" the damage. We are not confronted with a situation in which the existence of damage was doubtful. Markel concedes that each of the 465 homes for which Lennar sought to recover remediation costs was actually damaged. Nor could Lennar have located all the damage, which was hidden from sight, without removing all the EIFS. The court of appeals' characterization of efforts to determine all the damaged areas of homes as preventative measures is not supported by the record.

We thus conclude that Lennar's evidence supported the jury's verdict.

**B**

According to the evidence at trial, water damage from EIFS begins within six to twelve months after home construction is completed and continues until it is repaired. Lennar stopped using EIFS in 1998. Markel's policy was in effect throughout 1999 and until October 2000. A fair inference from the record is that most of the damage to the homes began before or during Markel's policy period and continued afterward. Markel agrees that all the homes for which Lennar claims remediation costs sustained some damage during the policy period, but it insists that only the costs for remediating the damage in existence during the policy period are covered losses. Lennar concedes that it did not attempt to prove the specific amount of damage to each house during the

---

[40] *Zurich Am. Ins. Co. v. Nokia, Inc.*, 268 S.W.3d 487, 499 (Tex. 2008) (stating with respect to commercial general liability insurance policies, that "'damages because of bodily injury' is susceptible to a broad definition").

policy period but contends that it would be practically impossible to do so and that the policy does not require it.

Coverage under Markel's policy is limited to property damage that occurs during the policy period but expressly includes damage from a continuous exposure to the same harmful conditions. For damage that occurs during the policy period, coverage extends to the "total amount" of loss suffered as a result, not just the loss incurred during the policy period. No question remains that all 465 houses at issue suffered property damage during the policy period, which began before or during the policy period and continued until it was repaired, all because of water trapped in home walls by EIFS applied to wood-frame construction. Thus, the policy covered Lennar's total remediation costs.

This reading of the policy is confirmed by our decision in *American Physicians Insurance Exchange v. Garcia*.[41]  In the underlying suit, plaintiffs alleged that the defendant physician's negligence in treating their decedent extended over two-and-one-half years, during which the physician was covered at various times by four non-overlapping policies, one with $100,000 limits and the other three with $500,000 limits.[42] Plaintiffs contended that the policies could be "stacked" to provide a total of $1.6 million in coverage and demanded that the insurers settle for that amount. After the insurers refused, plaintiffs obtained a judgment against the physician in excess of that amount, and, as the physician's assignees, sued the insurers under *Stowers*.[43]  We rejected the plaintiffs' stacking argument, explaining instead:

---

[41] 876 S.W.2d 842 (Tex. 1994).

[42] *Id.* at 843–844.

[43] *Id.* at 853.

14

> If a single occurrence triggers more than one policy, covering different policy periods, then different limits may have applied at different times. In such a case, the insured's indemnity limit should be whatever limit applied at the single point in time during the coverage periods of the triggered policies when the insured's limit was highest. The insured is generally in the best position to identify the policy or policies that would maximize coverage. Once the applicable limit is identified, all insurers whose policies are triggered must allocate funding of the indemnity limit among themselves according to their subrogation rights.[44]

Markel dismisses this as dicta, but having said what the policy limits were not, it was important for us to say what they were and why. Our decision provides the rule governing the situation described.

Markel argues alternatively that it should be responsible along with Lennar's other insurers only for its pro rata share of the total remediation expenses. *Garcia* rejects this approach, leaving up to insurers who share responsibility for a loss to allocate it among themselves according to their subrogation rights. Markel urges us to abandon *Garcia*, based on recent cases in other jurisdictions that take a pro rata approach.[45] While we have acknowledged that allocation issues have been treated differently in other jurisdictions,[46] the decisions of those courts do not persuade us to reconsider ours in *Garcia*.

We conclude that Markel's policy covered Lennar's entire remediation costs for damaged homes.

*    *    *

---

[44] *Id.* at 855 (footnote omitted).

[45] *See Boston Gas Co. v. Century Indem. Co.,* 910 N.E.2d 290 (Mass. 2009); *EnergyNorth Natural Gas, Inc. v. Certain Underwriters at Lloyd's,* 934 A.2d 517 (N.H. 2007); *Crossmann Cmtys. of N.C., Inc. v. Harleysville Mut. Ins. Co.,* 717 S.E.2d 589 (S.C. 2011).

[46] *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 31 n.45 (Tex. 2008).

15

Lennar's responsible efforts to correct defects in its home construction did not absolve Markel of responsibility for the costs under its liability policy.  We reverse the judgment of the court of appeals and affirm the judgment of the trial court.

_____
Nathan L. Hecht
Justice

Opinion delivered: August 23, 2013