**THRUWAY PRODUCE, INC., Plaintiff,**

v.

**MASSACHUSETTS BAY INSURANCE COMPANY, Defendant.**

**No. 6:11–CV–6337 EAW.**

United States District Court, W.D. New York.

Signed July 20, 2015.

John R. Condren, Rupp, Baase, Pfalzgraf, Cunningham & Coppola LLC, Buffalo, NY, for Plaintiff.

Sharon Angelino, Goldberg Segalla LLP, Buffalo, NY, for Defendant.

## DECISION AND ORDER

ELIZABETH A. WOLFORD, District Judge.

### INTRODUCTION

Plaintiff Thruway Produce, Inc. ("Plaintiff") has sued Defendant Massachusetts Bay Insurance Company ("Defendant") for declaratory relief. Specifically, Plaintiff seeks a declaration that Defendant has a duty, pursuant to two insurance policies, to defend and indemnify Plaintiff in an underlying action brought by a baby-food company concerning a recall of baby food containing adulterated apples supplied by Plaintiff, which is pending in this Court and entitled *Milnot Holding Company v. Thruway Produce, Inc.*, No. 08–CV–6140 CJS (the "Milnot action").

Plaintiff and Defendant have each moved for summary judgment. (Dkt. 39 and 40). Plaintiff seeks summary judgment on its claim for a declaration that Defendant is obligated to defend and indemnify Plaintiff with respect to the Milnot action (Count I of the Complaint) and its claim for a declaration that Defendant is estopped from denying coverage based upon certain representations Defendant made to Plaintiff (Count II of the Complaint). (Dkt. 40–7 at 5; Dkt. 1). In its cross-motion for summary judgment, Defendant asks the Court to find as a matter of law that the claims underlying the Milnot action are not within the scope of the policies' coverage and thus that Defendant has no obligation to defend or indemnify Plaintiff. (Dkt. 39–24 at 14). Defendant also asks the Court to find as a matter of law that Plaintiff's estoppel claim is baseless. (*Id.* at 26–27).

For the reasons set forth below, Plaintiffs motion for summary judgment is granted in part, insofar as Plaintiff seeks a declaration that Defendant has a duty to defend. Plaintiff's motion for summary judgment is otherwise denied, and Defendant's motion for summary judgment is denied.

### BACKGROUND

Plaintiff is a supplier of produce in New York. (Case No. 08–CV–6140, Dkt. 1 at 6). Defendant is an insurance company that issued two casualty insurance policies to Plaintiff. (Dkt. 39–1 at ¶¶ 25–26; Dkt. 40–6 at ¶¶ 5, 10). Plaintiff seeks defense and indemnification from Defendant in connection with the Milnot action pursuant to the policies.

### I. Milnot Action

In the underlying action, the plaintiff is Milnot Holding Company ("Milnot"), a baby-food manufacturer. (Dkt. 39–1 at ¶ 8; Dkt. 40–6 at ¶ 12). Under the brand name "Beech–Nut," Milnot manufactures and sells baby food for eventual distribution to retail outlets across the United States and in twenty-two countries. (Case No. 08–CV–6140, Dkt. 1 at ¶ 8). Milnot entered into a contract with Plaintiff, whereby Plaintiff was required to supply apples to Milnot for the 2005/2006 season. (*See* Dkt. 40–6 at ¶ 12; Dkt. 44 at ¶ 12). Under the terms of the contract, the apples were required to be free of the rodenticides Brodifacoum and Bromadiolone, which are commonly found in baits used to kill rats and mice. (Case No. 08–CV–6140, Dkt. 1 at ¶ 31, Dkt. 177 at 2).

To fulfill Plaintiff's obligations under the contract, Plaintiff purchased apples from various growers, stored the apples at various storage facilities, and then provided the apples to Milnot as needed. (Dkt. 40–6 at ¶ 12; Dkt. 44 at ¶ 12). On four occasions in 2006, Milnot discovered rodenticide mixed in with the apples that had been supplied by Plaintiff. (Dkt. 40–6 at

¶ 12; Dkt. 44 at ¶ 12). "The apples were subsequently incorporated into the baby food manufactured by Milnot, and following the discovery of the rodenticide, Milnot removed the affected baby food from commerce." (Dkt. 40–6 at ¶ 12; Dkt. 44 at ¶ 12; *see also* Case No. 08–CV–6140, Dkt. 114–1 at ¶ 19).[1] Beech–Nut issued a product recall notice as to the baby food that had already been shipped into commerce. (Dkt. 40–6 at ¶ 12; Dkt. 44 at ¶ 12).

As a result of the contaminated apples and ensuing product recall, Milnot sued Plaintiff. (Dkt. 39–1 at ¶¶ 8–9; Dkt. 40–6 at ¶ 12). In the underlying complaint, Milnot alleged that Plaintiff had breached the supply contract and various express and implied warranties, and that Milnot had been forced to institute a product recall as a result of the alleged breaches. (Dkt. 39–1 at ¶¶ 9–10; Dkt. 40–6 at ¶ 12).[2] Milnot claimed monetary damages in an amount not less than $1,522,122.00. (Dkt. 40–6 at ¶ 12; Dkt. 44 at ¶ 12; Case No. 08–CV–6140, Dkt. 1). On February 11, 2014, the Court in the Milnot action granted partial summary judgment to Milnot as to liability on the contractual/warranty claims. (Dkt. 39–1 at ¶ 11; Dkt. 40–6 at ¶ 13). The issue of damages has not yet been tried or otherwise resolved in the underlying action.[3]

Plaintiff provided notice to Defendant of a potential claim against it related to its sale of contaminated apples to Milnot on March 21, 2006. (Dkt. 39–1 at ¶ 14). On July 12, 2006, Defendant paid Plaintiff $50,000 pursuant to the product recall coverage available under an endorsement to the Primary Policy. (Dkt. 39–1 at ¶ 18).

## II. The Policies

Defendant issued the following two policies to Plaintiff: a commercial general liability policy bearing number ZDS 6698406 with effective dates from June 30, 2005, to June 30, 2006 (the "Primary Policy") (Dkt. 39–1 at ¶ 25; Dkt. 40–6 at ¶ 5), and an excess/umbrella policy bearing number UHS 6724899 with effective dates from June 30, 2005, to June 30, 2006 (the "Excess/Umbrella Policy") (Dkt. 39–1 at ¶ 26; Dkt. 40–6 at ¶ 10) (hereinafter collectively "the Policies").

1. At oral argument, defense counsel suggested that some of the contaminated apples delivered to Milnot may not have been incorporated into the finished product and that Milnot may seek to recover from Plaintiff the costs associated with the destruction of the contaminated, yet unincorporated, apples. While the Court does not doubt that very real possibility, neither the parties' Statements of Facts (Dkt. 39–1, 40–6) nor the underlying complaint (Case No. 08–CV–6140, Dkt. 1) specifically asserts that Milnot is seeking to recover damages for the destruction of contaminated, yet unincorporated, apples. The Court declines to analyze separately the issue of coverage for this new category of alleged damages, which was raised for the first time at oral argument. If necessary, the Court will revisit the issue of Defendant's duty to indemnify this category of damages at a later juncture, once the issue of damages has been resolved in the underlying action.

2. Milnot also alleged tort claims in the underlying complaint against Plaintiff, although the Court's finding of Plaintiff's liability to Milnot in the underlying action was based only upon the breach of contract/breach of warranty claims. (Case No. 08–CV6140, Dkt. 1, Dkt. 177).

3. Neither the underlying complaint nor the present record contains any kind of itemization of the damages being sought in the Milnot action. According to Plaintiff's Statement of Facts filed in this action, Milnot has claimed monetary damages for "among other items of loss, product recall and disposal." (Dkt. 40–6 at ¶ 12). Defendant does not dispute this allegation of fact. (Dkt. 44 at ¶ 12). It is unclear what "other items of loss" are being sought in the Milnot action.

### A. Coverage and Definitions for "Property Damage" and "Occurrence"

The Policies provide coverage, in relevant part, for "property damage" caused by an "occurrence," (Dkt. 39–10 at 17; 39–16 at 6). The Primary Policy provides definitions for the terms "Occurrence" and "Property damage." (Dkt. 39–11 at 11–12).[4] The term "Occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Dkt. 39–11 at 11). The term "Property damage" is defined, in relevant part, as follows:

a. Physical damage to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

(Dkt. 39–11 at 12).

### B. Exclusions for Damages to "Your Product," "Your Work," and "Impaired Property"

The Primary Policy contains exclusions for "Damage to Your Product," "Damage to Your Work," and "Damage to Impaired Property or Property Not Physically Injured."[5]

#### 1. Exclusion for "Damage to Your Product"

Under the exclusion for "Damage to Your Product," the Primary Policy provides that the insurance does not apply to "Property damage" to "your product" aris-

ing out of it or any part of it. (Dkt. 39–11 at 2). The term "Your product" is defined, in relevant part, as follows:

Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(a) You;

(b) Others trading under your name; or

(c) A person or organization whose business or assets you have acquired . . . .

(Dkt. 39–11 at 12).

#### 2. Exclusion for "Damage to Your Work"

Under the exclusion for "Damage to Your Work," the Primary Policy provides that the insurance does not apply to the following:

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

(Dkt. 39–11 at 2). The term "Your work" is a defined term in the Policies, as follows:

"Your work":

a. Means:

(1) Work or operations performed by you or on your behalf; and

(2) Materials, parts or equipment furnished in connection with such work or operations.

---

4. Coverage A of the Excess/Umbrella Policy follows the form of the Primary Policy and thereby adopts these definitions. (Dkt. 39–16 at 6). Coverage B of the Excess/Umbrella Policy contains nearly identical definitions of the terms "Occurrence" and "Property damage," and neither party argues that the differences are material. (Dkt. 39–16 at 14–15).

5. Coverage A of the Excess/Umbrella Policy follows the form of the Primary Policy and thereby adopts the same exclusions. (Dkt. 39–16 at 6). Coverage B of the Excess/Umbrella Policy contains nearly identical exclusions and relevant definitions, and neither party argues the differences are material. (Dkt. 39–16 at 9, 12, 15).

b. Includes[:]

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"....

(Dkt. 39–11 at 13).

### 3. Exclusion for "Damage to Impaired Property ..."

Under the exclusion for "Damage to Impaired Property or Property Not Physically Injured," the Primary Policy provides that the insurance does not apply to the following:

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

(Dkt. 39–11 at 2). The term "Impaired property" is defined as follows:

"Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

b. You have failed to fulfill the terms of a contract or agreement;

*if such property can be restored to use by:*

a. The repair, replacement, adjustment or removal of "your product" or "your work"; or

b. Your fulfilling the terms of the contract or agreement.

(Dkt. 39–11 at 10 (emphasis added)).

### C. Exclusion for Product Recalls

#### 1. Product Recall Exclusion in the Primary Policy

The Primary Policy contains limited coverage for "Product Recall Expenses" by Special Broadening Endorsement. The Endorsement provides coverage in the following amounts: Each Occurrence Limit: $25,000; Aggregate Limit: $50,000. (Dkt. 39–10 at 1).

Under the Endorsement, the exclusion in the Primary Policy for "Recall of Products, Work or Impaired Property" (Dkt. 39–11 at 2) is replaced in its entirety by the following:

n. Recall of Products, Work or Impaired Property

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) "Your product";

(2) "Your work"; or

(3) "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it, but this exclusion does not apply to "product recall expenses" that you incur for the "covered recall" of "your product". The exception to the exclusion does not apply to "Product recall expenses" resulting from....

. . . .

(6) Under Section V—Definitions, the following definitions are added;

25. "Covered recall" means a recall made necessary because you or a government body has determined that a known or suspected defect, deficiency, inadequacy, or dangerous condition in "your product" has resulted or will result in "bodily injury" or "property damage".

26. "Product recall expense" means:

a. Necessary and reasonable expenses . . . [y]ou incur exclusively for the purpose of recalling "your product"; and

b. Your lost profit resulting from such "covered recall".

(Dkt. 39–10 at 13–14).

### 2. Product Recall Exclusions in the Excess/Umbrella Policy

Coverage A of the Excess/Umbrella Policy contains an exclusion by endorsement, called "Recall of Products, Work or Impaired Property," as follows:

Under Coverage A, this policy does not apply to any liability or expense Incurred by **You** or others for the loss or use, withdrawal, recall, inspection, replacement, adjustment, removal or disposal of:

1. [Y]our product;

2. [Y]our work; or

3. Impaired property;

if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

(Dkt. 39–16 at 22 (emphasis in original)). Coverage B of the Excess/Umbrella Policy contains a like exclusion with nearly identical language, and neither party argues that the differences in the language are material. (Dkt. 39–16 at 10).

### III. The Instant Action

Plaintiff commenced the instant action in New York State Supreme Court, Orleans County, on June 6, 2011. (Dkt. 1 at ¶1). Defendant removed the action to this Court on the basis of diversity jurisdiction on July 7, 2011. (Dkt. 1). Defendant filed its answer on July 28, 2011. (Dkt. 8). Discovery closed on October 31, 2014. (Dkt. 38). Defendant filed a motion for summary judgment on January 29, 2015 (Dkt. 39); Plaintiff filed a motion for summary judgment on January 30, 2015 (Dkt. 40). The parties filed opposition papers on March 6, 2015 (Dkt. 43–45), and Defendant filed reply papers on March 27, 2015 (Dkt. 46). Oral argument was held on June 2, 2015, and the Court reserved decision. (Dkt. 42).

### DISCUSSION

### I. Legal Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party. *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Once the moving party has met its burden, the opposing party " 'must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*' " *Caldarola v. Calabrese*, 298 F.3d 156, 160

(2d Cir.2002) (quoting *Matsushita Elec.*, 475 U.S. at 586–87, 106 S.Ct. 1348) (emphasis in original). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment...." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original).

A federal court sitting in diversity applies state substantive law. *See Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996) ("[F]ederal courts sitting in diversity apply stale substantive law and federal procedural law"). Here, applying the choice-of-law rules of New York, the Court has determined that New York law applies. Neither party disputes that New York law governs this action.

## II. Duty to Defend

■ "New York law distinguishes between the duty to indemnify and the duty to defend, applying very different presumptions to each." *CGS Indus., Inc. v. Charter Oak Fire Ins. Co.*, 720 F.3d 71, 76–77 (2d Cir.2013) (citations and quotation omitted and alteration in original). As explained by the Second Circuit Court of Appeals:

> The duty to defend is broader than the duty to indemnify.... Even where the insurer ultimately has no duty to indemnify due to policy exclusions, it may still be obligated to defend the insured until the applicability of the exclusions [is] determined. To avoid the duty to defend, an insurer must demonstrate that the allegations of an underlying complaint place that pleading solely and entirely within the exclusions of the policy and that the allegations are subject to no other interpretation.

*Id.* (citations and quotations omitted and alteration in original). As a result, "an insurer has a duty to defend even if facts outside the four corners of those pleadings indicate that the claim may be meritless or not covered." *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.,* 302 F.3d 83, 97 (2d Cir.2002) (quotation omitted). However, the insurer's duty to defend ends "if it establishes as a matter of law that there is no possible factual or legal basis on which it might eventually be obligated to indemnify its insured under any policy provision." *Id.* (quotation omitted).

Defendant maintains that it can establish as a matter of law that there is no possible basis on which it might be obligated to indemnify Plaintiff for the claims in the Milnot action. Defendant specifically argues that under both the Primary Policy and the Excess/Umbrella Policy, coverage is only triggered if there has been "property damage" caused by an "occurrence." (Dkt. 39–24). According to Defendant, damage to Plaintiff's own work or products does not constitute an "occurrence" under well-established New York law. (*Id.*). In addition, Defendant argues that the allegations in the underlying action place the claims against Plaintiff within the exclusions in the Policies. (*Id.*). By contrast, Plaintiff argues that it can show as a matter of law that the losses involved in the Milnot action constitute "property damage" as the result of an "occurrence" and that none of the exclusions apply. (Dkt. 40–7).

■ Under New York law, "an insurance contract is interpreted to give effect to the intent of the parties as expressed in the clear language of the contract." *Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir.2006) (citation and quotation omitted). If the terms of the insurance contract are unambiguous, the Court will enforce the contract as it is written. *See id.* If the terms of the insurance contract are

ambiguous, the ambiguity is resolved in favor of the insured. *See Goldberger v. Paul Revere Life Ins. Co.*, 165 F.3d 180, 182 (2d Cir.1999). Whether an ambiguity exists is a "threshold question of law to be determined by the court." *Duane Reade Inc. v. St. Paul Fire and Marine Ins. Co.*, 411 F.3d 384, 390 (2d Cir.2005).

To resolve the parties' competing motions for summary judgment, the Court must, in view of the allegations of the underlying complaint, determine whether the damages claimed in the Milnot action constitute "property damage" caused by an "occurrence," as those terms arc defined in the Policies, and, if so, whether, nevertheless, any exclusion set forth in the Policies and raised by Defendant applies.

### A. Occurrence

#### 1. The Unintended Contamination of Apples and Other Resulting Harm Arose out of an "Occurrence."

█ The Policies in this case define "occurrence" to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Dkt. 39–11 at 11). Plaintiff urges the Court to adopt the construction of the term "occurrence" that the Second Circuit Court of Appeals used in *Aetna Casualty and Surety Co. v. General Time Corp.*, 704 F.2d 80 (2d Cir.1983). Using the construction adopted in *Aetna*, Plaintiff argues that the damages claimed in the Milnot action were caused by an "occurrence" because the contamination of the apples and resulting damage to the baby food was not expected or done on purpose. (Dkt. 40–7 at 11).

Like the Policies at issue here, the policies at issue in *Aetna* defined the term "occurrence" as an "accident." 704 F.2d at 82. Construing the term "accident" from

the standpoint of the insured and using the law of New York as a guide,[6] the *Aetna* court explained that an "accident" is an "unexpected, unfortunate occurrence ... which was not done on purpose." *Id.* (citations and internal quotation marks omitted). The court added that the transaction giving rise to the loss must be examined as a whole. *Id.* Applying that definition, the *Aetna* court affirmed the district court's holding (following a bench trial) that because the insured, who had supplied electric motors to a manufacturer of radiators, "neither intended nor expected its motors to malfunction," the resulting damage to the zone valves in the radiators was an "occurrence" within the meaning of the policies. *Id.* at 82–83.

A similarly broad construction of the terms "occurrence" and "accident" led the New York Court of Appeals to hold that an insurer had a duty to defend in *Sturges Manufacturing Co. v. Utica Mutual Insurance Co.*, 37 N.Y.2d 69, 371 N.Y.S.2d 444, 332 N.E.2d 319 (1975). In that case, a supplier of ski straps was sued for breach of warranty and negligence by a manufacturer, who had bought the straps for use in the production of ski bindings. *Id.* at 70, 371 N.Y.S.2d 444, 332 N.E.2d 319. Due to allegedly defective stitching, the straps broke under stress and caused damage to the bindings. *Id.* at 71, 371 N.Y.S.2d 444, 332 N.E.2d 319. Although the insurer claimed that there was no "occurrence," New York's highest court disagreed, stating:

> The insurance policy at issue covers, among other risks, liability for "property damage" defined as "injury to or destruction of tangible property." The damage must result from an "occurrence", equated with "an accident". The insurer asserts that there was no "occurrence". *These terms are, however, obvi-*

---

**6.** In *Aetna*, Connecticut law applied. 704 F.2d at 82. Because there was no Connecti-

cut law on the issue, the court applied New York law as a guide. *Id.*

*ously broad, and would encompass the unexpected breakage of the Sturges straps and other harm flowing from it.* *Id.* at 72, 371 N.Y.S.2d 444, 332 N.E.2d 319 (emphasis added).

Relying upon *Sturges* and other New York appellate cases, a federal district court summarized New York law on the definition of "occurrence" in the context of incorporation cases similar to this one, as follows: "where the insured unintentionally sells a product that is allegedly defective and that is incorporated into a third-party's finished product, the resulting impairment to the finished product is an 'occurrence.'" *Chubb Ins. Co. of New Jersey v. Hartford Fire Ins. Co.,* No. 97 CIV. 6935 LAP, 1999 WL 760206, at *4 (S.D.N.Y. Sept. 27, 1999) (collecting cases), *aff'd,* 229 F.3d 1135 (2d Cir.2000).

The facts in *Chubb,* where the court found the existence of an "occurrence" and held the insurer had a duty to defend, are remarkably similar to the facts at bar. There, the insured sold apple juice to beverage manufacturers for incorporation into the beverage manufacturers' products. 1999 WL 760206, at *1. The beverage manufacturers required the juice to be 100% pure apple juice concentrate. *Id.* Unbeknownst to the insured, the juice, which was produced by European manufacturers, contained an adulterating sweetener. *Id.*

The beverage manufacturers sued the insured for their losses, alleging, *inter alia,* claims for breach of contract and breach of warranty. *Id.* In holding that damage to the beverages arose out of an "occurrence," the court stated that the insurer failed to raise an issue of fact as to the insured's knowledge of the adulteration. *Id.* at *7. The court explained that there was no evidence that the insured intended or even knew that the juice it distributed was anything other than 100% pure juice. *Id.*

Here, as in *Aetna, Sturges,* and *Chubb,* the term "occurrence" is broadly defined in the Policies to mean an "accident." As defined, the term encompasses the unexpected and unintended contamination of the apples that resulted in damage to the baby-food product, into which the apples were inextricably incorporated. The record does not contain any evidence or even any argument that Plaintiff intended or knew that the apples supplied to Milnot were contaminated or would contaminate the baby-food product.[7]

**2. The Cases Cited by Defendant are Inapposite Because the Contaminated Apples Damaged Property Other Than the Defective Products Themselves.**

In support of its argument that Plaintiff's sale of contaminated apples resulting

**7.** As indicated by the Court in the underlying Milnot action, Plaintiff verbally instructed its apple growers not to use rodenticide inside their storage facilities. (Case No. 08–CV–6140, Dkt. 177 at 9, Dkt. 121–1 at ¶ 9). The evidence before the Court in the underlying Milnot action included an allegation that one or more storage facilities disregarded Plaintiff's instructions and used rodenticide inside their facilities (Case No. 08–CV–6140, Dkt. 177 at 2–3), and Plaintiff failed to monitor the use of rodenticide while the apples were in storage (Case No. 08–CV–6140, Dkt. 177 at 9). That allegation was not made in the complaint in the Milnot action, nor is there evidence of such in the record before this Court.

Indeed, more to the point, Defendant has not argued to this Court that Plaintiff's failure to monitor the practices of the growers with regard to rodenticide is evidence that Plaintiff itself intended or expected to supply contaminated apples. In fact, Defendant has not argued that the contamination was intentional from the standpoint of Plaintiff on any basis. At oral argument, counsel for Defendant conceded that the contamination was "unintentional" and instead argued that the "occurrence" requirement is not met because, in Defendant's view, a breach of contract arising out of the insured's defective product (even if caused by the insured's negligence) cannot constitute an "occurrence."

in damage to the baby food does not constitute an occurrence, Defendant argues that a commercial general liability insurance policy cannot afford coverage for an insured's breach of contract arising out of the insured's defective product, even where the breach causes damage to other property. Under Defendant's theory of the case, because the contaminated apples at issue here were Plaintiff's product, and because the Milnot action alleged a claim for breach of contract, there was no "occurrence" and the Policies' coverage provisions are not triggered.

Defendant contends that *Aetna* has been twice distinguished by the Second Circuit, citing *Jakobson Shipyard, Inc. v. Aetna Casualty & Surety Co.*, 961 F.2d 387 (2d Cir.1992) and *J.Z.G. Resources, Inc. v. King*, 987 F.2d 98 (2d Cir.1993), and has not been followed by recent federal district courts, citing *Federal Insurance Co. v. Marlyn Nutraceuticals, Inc.*, No. 13–CV–0137 (JS)(ARL), 2013 WL 6796162 (E.D.N.Y. Dec. 19, 2013). Instead, Defendant relies on a line of cases from the Appellate Division of the New York State Supreme Court holding that "the purpose of a commercial general liability policy ... is to provide coverage for tort liability for physical damage to others and not for contractual liability of the insured for economic loss because the product ... is not what the damaged [party] bargained for." *Bonded Concrete, Inc. v. Transcon. Ins. Co.*, 12 A.D.3d 761, 762, 784 N.Y.S.2d 212 (3d Dep't 2004) (quotation omitted).

The Court cannot agree with Defendant's reading of the case law. Defendant has not cited a single case where a New York court or a federal court applying New York law has held that an insured's breach of contract cannot constitute an occurrence where there is actual physical damage to property other than the defective property of the insured. In the cases upon which Defendant relies, the primary of which are discussed below, where the courts held that an insured's breach of contract cannot constitute an occurrence, the only damages claimed were to the defective product supplied by the insured.

For example, in *Jakobson*, a case cited by Defendant, the damage was to the tugboats supplied by the insured. There, the insured, who was a tugboat manufacturer, sought a declaration that the insurer had a duty to defend a suit against it involving breach of contract and breach of warranty claims arising out of allegedly defectively-installed steering mechanisms in the tugboats. 961 F.2d at 389. Applying New York law, the Second Circuit Court of Appeals held that there was no "occurrence" because the damages at issue "were the result of faulty workmanship that did not comply with the specifications of the contract and [the underlying] action sounded in contract. There was no chance occurrence, no unknown or remote cause, and no unexpected external force." *Id.* In so holding, the *Jakobson* court distinguished *Aetna*. While in *Aetna* the defective motors were an "external force" that caused damage to the third-party buyer's radiators, the court explained that "[t]he faulty steering mechanisms in the [*Jakobson*] case did not damage property other than the tugs purchased from [the insured] under the contractual arrangements in question." *Id.* at 389–90.

Similarly, in *J.Z.G. Resources*, the court denied coverage because the only damages claimed were to the faulty roads constructed by the insured. Significantly, *J.Z.G. Resources* reaffirmed that under New York law, a transaction is considered an "accident" if "the claim against the insured was not simply one for faulty workmanship, but rather for consequential property damage inflicted upon a third party as a result of the insured's activity." 987 F.2d at 102.

Likewise, in *Marlyn*, the only claimed damages were to the tablets themselves supplied by the insured. There, the insured packaged and sold probiotic tablets to a third-party buyer, which then resold the tablets in their original form and packaging to retail stores. 2013 WL 6796162, at *1, The buyer sued the insured, claiming that the tablets were contaminated. *Id.* The court held that the insurance company had no duty to defend or indemnify the insured because, *inter alia,* the underlying action did not involve an "occurrence." *Id.* at *5–6. The court reasoned that the case fell within the purview of *Jakobson* and *J.Z.G. Resources,* rather than *Aetna,* because "contamination in the tablets is a product defect causing damage to the tablets themselves, and not an instance in which damage has occurred to other property." *Id.* at *6.

Lastly, in *Bonded Concrete,* the damage was to the concrete provided by the insured. The court held that the claims against the insured for the defective concrete were not covered under the commercial general liability policy because the damages sought were for "correcting the defect, not damage to property other than the completed work itself." 12 A.D.3d at 762, 784 N.Y.S.2d 212. Although "the subject concrete was not a component of any other larger structure," the court nevertheless reaffirmed the general rule that "a commercial general liability policy provides coverage for damages when an insured's defective product is a mere component of another product or structure." *Id.* at 763, 784 N.Y.S.2d 212.

■ Unlike the damaged tugs in *Jakobson,* the faulty roads in *J.Z.G. Resources,* the contaminated tablets in *Marlyn,* and the defective concrete in *Bonded Concrete,*

the contaminated apples in this case caused damage to property other than the defective products themselves. The contamination caused damage to Milnot's baby food. None of the cases cited by Defendant suggest that *Aetna* is no longer good law in a case, such as this one, where the insured's defective product causes "actual physical damage to property other than the property of the insured." 704 F.2d at 83. On the contrary, the aforementioned cases reaffirm that under New York law, when an insured sells a product that the insured neither intended nor expected to be defective, and that product is incorporated into a third-party's product and proves defective, the resulting damage to the third-party's product arises out of an "occurrence." [8]

■ Defendant's position that a breach of contract or warranty can never constitute an "occurrence" was expressly rejected by the Second Circuit in its unpublished opinion affirming the district court's grant of partial summary judgment in *Chubb Ins. Co. of New Jersey v. Hartford Fire Ins. Co.,* No. 97 CIV. 6935 LAP, 1999 WL 760206 (S.D.N.Y. Sept. 27, 1999), *aff'd,* 229 F.3d 1135 (2d Cir.2000) ("[W]e reject Hartford's argument that a breach of contract or warranty can never constitute an 'occurrence.' "). As stated by the Second Circuit, "a breach of contract or warranty can be an 'occurrence' if, as a result of the breach, property sold by the insured to a third party, which was then incorporated into other property belonging to the third party, caused damage to this other property." 229 F.3d 1135.

Because there is no evidence or argument in the record that Plaintiff intended or expected the apples to be contaminated, and the undisputed evidence shows that

---

**8.** To the extent that the *Jakobson* court was searching for some "external force" that caused the third-party damage, the contaminated apples were such an "external force"

that caused damage to the baby food, *Jakobson,* 961 F.2d at 389–90 (adding that "in common parlance an external force of some kind is usually involved").

the apples were incorporated into Milnot's baby food, the resulting damage to the baby food in the Milnot action arose out of an occurrence. Accordingly, Plaintiff has shown as a matter of law that the claims underlying the Milnot action arose out of an "occurrence."

## B. Property Damage

Defendant argues that the losses alleged in the Milnot action do not constitute "property damage" as defined in the Policies. Specifically, Defendant argues that the only damages sought in the Milnot action are for economic damages, and that economic damages do not constitute "property damage" as a matter of law. (Dkt. 39–24 at 15–17). The term "Property damage" is defined in the Policies, in relevant part, as follows:

> Physical damage to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it. . . .

(Dkt. 39–11 at 12).

In *Stonewall Insurance Co. v. Asbestos Claims Management Corp.*, 73 F.3d 1178 (2d Cir.1995), the Second Circuit Court of Appeals considered the difference between "property damage" and "economic loss." The court explained that where the underlying claims allege that the defective materials have "caused injury to other property," including property into which they were incorporated, "[s]uch claims are for 'property damage,' not economic loss." *Id.* at 1208–09.

In this case, as alleged in the underlying complaint, the contaminated apples were incorporated into Milnot's baby-food product, which became damaged thereby. Milnot incurred, among other items of loss, expenses related to the product recall and

the destruction of the damaged product. Hence, the undisputed record establishes that the contaminated apples caused "property damage," i.e. "[p]hysical damage to tangible property, including all resulting loss of use of that property." As a result, Defendant is obligated to defend Plaintiff in the underlying action. Defendant can only be relieved of this duty if it establishes that there is no basis on which the allegations of the underlying complaint can come within the Policies. Defendant has failed to do so.

The cases cited by Defendant do not change this analysis. In *Zurich–American Insurance Co. v. Audiovox Corp.*, 294 A.D.2d 194, 741 N.Y.S.2d 692 (1st Dep't 2002), the underlying action specifically disclaimed the recovery for anything other than economic damages. *Id.* at 194, 741 N.Y.S.2d 692. Similarly, in *Direct Travel, Inc. v. Aetna Casualty & Surety Co.*, 214 A.D.2d 484, 625 N.Y.S.2d 221 (1st Dep't 1995), there was apparently no dispute that the claims in the underlying action were for "economic loss resulting from the plaintiff's purported breach of contract. . . ." *Id.* at 485, 625 N.Y.S.2d 221. Neither of these cases addresses the meaning or application of the term "property damage" in a case, such as this one, where the defective product caused damage to other property into which the defective property was incorporated.

Here, the tainted apples provided by Plaintiff were incorporated into Milnot's baby food and rendered that baby food unusable. The contamination caused "[p]hysical damage to tangible property" as defined in the Policies. Therefore, the Court finds, as a matter of law, that the damage to Milnot's baby food caused by incorporation of the tainted apples constituted "property damage." [9]

9. Although the Court finds that the underlying action falls within the scope of the risk covered by the Policies because the underlying complaint alleges "property damage" to the baby food caused by an "occurrence," the

## C. Policy Exclusions

Defendant argues that it is entitled to summary judgment that it has no duty to defend or indemnify based on certain exclusions set forth in the Policies. Specifically, Defendant argues it is entitled to summary judgment based on: (1) the exclusion for "Recall of Products, Work or Impaired Property"; and (2) the exclusions for "Damage to Your Product," "Damage to Your Work," and "Damage to Impaired Property." (Dkt. 39–24 at 17–26). Plaintiff argues that these exclusions do not apply because the product recall and the property damage at issue in the underlying action did not occur with respect to Plaintiffs product or work; rather, Plaintiffs defective work/product was integrated into a larger product and that larger product was allegedly damaged and recalled.

 "[T]o negate coverage by virtue of an exclusion [in an insurance policy], an insurer must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case and that its interpretation of the exclusion is the only construction that [could] fairly be placed thereon." *Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir.2006) (quotation omitted). The insurer bears the heavy burden of demonstrating that the exclusion applies. *Id.*

For the reasons set forth below, the Court finds that Defendant has not established that the allegations of the underlying complaint place the Milnot action entirely within one or more of the exclusions and, therefore, Defendant has a duty to defend Plaintiff in the Milnot action.

## 1. The Recall Exclusion

The Primary Policy contains an exclusion for the "Recall of Products, Work or Impaired Property" with limited coverage for certain "Product Recall Expenses" by virtue of a Special Broadening Endorsement. The exclusionary provision reads, in relevant part, as follows:

Recall of Products, Work or Impaired Property

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) "Your product";

(2) "Your work"; or

(3) "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it. . . .

(Dkt. 39–10 at 13–14). The coverages under the Excess/Umbrella Policy contain product recall exclusions with nearly identical language to that quoted above. (Dkt. 39–16 at 10, 22).

 At oral argument, Defendant specifically argued that the recall exclusion under the Policies applies because the damages claimed in the Milnot action are for the recall of "Your Product." The term "Your product" is defined as follows:

Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(a) You;

Court makes no determination as to whether each and every item of damages that might be proven in the Milnot action constitutes "property damage" as defined in the Policies. The underlying complaint does not contain an itemization of the damages claimed, and the issue of damages has not been tried or otherwise resolved in the underlying action.

(b) Others trading under your name; or

(c) A person or organization whose business or assets you have acquired....

(Dkt. 39–11 at 12).

In this case, Defendant has not carried its burden of establishing as a matter of law that the claims in the Milnot action fall within the Policies' product recall exclusion. The Policies exclude coverage as to claims for damages incident to the recall of "your product," i.e. Plaintiff's own product. The apples themselves were not recalled. Rather, the baby food into which the apples were incorporated was recalled. Defendant has thus not shown that the Milnot action relates to the recall of "your product," as is required by the unambiguous language of the product recall exclusion.[10] *See Netherlands Ins. Co. v. Main Street Ingredients, LLC*, 745 F.3d 909, 919 (8th Cir.2014) ("We have already concluded the damages sought here were not for the recall—issued by Plainview—of "[y]our product," as defined in the policy. The property damage claim was for Malt–O–Meal's property damages. Construing the recall exclusion "strictly against the insurer," as we must, we conclude the district court correctly found the exclusion does not apply." (citation omitted)). Accordingly, Defendant has not demonstrated entitlement to summary judgment on the basis of the product recall exclusion.

## 2. The "Your Work," "Your Product," and "Impaired Property" Exclusions

In addition to the product recall exclusion discussed above, Defendant argues that it is entitled to summary judgment

because the allegations of the underlying complaint fall within the exclusions for damage to "your work," "your product," and "impaired property." (*See* Dkt. 39–24 at 22–26). Defendant has not carried the heavy burden of showing as a matter of law that these exclusions apply in this case.

First, Defendant has not shown that the Milnot action seeks recovery for damages to "your product" or "your work," as defined in the Policies. "Exclusions like the 'Your Product' exclusion ... are intended to exclude coverage for damage to the insured's product, but not for damage caused by the insured's product to persons or property other than the insured's own product." *Tradin Organics USA, Inc. v. Maryland Cas. Co.*, 325 Fed.Appx. 10, 11 (2d Cir.2009). Courts construing exclusions similar to those at issue here have repeatedly explained that " '[t]he policy was clearly intended to cover the possibility that the insured's product, once sold, would cause ... damage to property other than the product itself....' " *Hartog Rahal P'ship v. Am. Motorists Ins. Co.*, 359 F.Supp.2d 331, 333 (S.D.N.Y.2005) (quoting *Lowville Producer's Dairy Co–Operative, Inc. v. American Motorists Ins. Co.*, 198 A.D.2d 851, 853, 604 N.Y.S.2d 421 (4th Dep't 1993)); *see also Harleysville Worcester Ins. Co. v. Paramount Concrete, Inc.*, 10 F.Supp.3d 252, 266 (D.Conn.2014) ("your product" exclusion was not applicable because the insured's product was incorporated into and caused damage to a larger product); *Travelers Indem. Co. v. Dammann & Co.*, No. Civ. 04–5699DRD, 2008 WL 370914, at *8 (D.N.J. Feb. 11, 2008)

---

10. Although Defendant specifically argued at oral argument that the recall exclusion applies to this case based upon its theory that the Milnot action alleged a recall of "your product," the exclusion, by its terms, also applies to losses incurred for the recall of "your work" and "impaired property." As further discussed in the following section of this Decision and Order, Defendant also cannot show that the recall related to "your work" or "impaired property," as defined by the Policies.

(damage to vanilla extract caused by defective vanilla beans provided by insured was not damage to "your product" because "[t]he exclusionary provisions do not apply to damages for loss or destruction of the buyer's products when such loss is due to a defect in the insured's product later incorporated into the buyer's product" (quotation omitted)).

■ Likewise, Defendant has not shown that the tainted baby food constituted "impaired property" because, as Defendant concedes in its moving papers, the Policies limit impaired property to "property [that] can be restored to use by repair, removal, or replacement of the work or product, or by fulfilling the terms of the contract." (Dkt. 39–24 at 25). Defendant has not presented any argument or evidence as to how baby food tainted with rat poison could be restored to use in any fashion. *See Harleysville Worcester*, 10 F.Supp.3d at 269 ("impaired property" exclusion "does not bar coverage in cases where the insured's defective product has been inextricably incorporated into a finished product, such that it is impossible to remove the component from the whole"). Defendant has not shown that the tainted apples provided by Plaintiff could have been removed from the baby-food product.

In sum, Defendant has not shown that any of the exclusions set forth in the Policies apply to the damages alleged in the Milnot action as a matter of law. Moreover, as discussed above, Plaintiff has shown as a matter of law that the incorporation of its tainted apples into Milnot's baby food constituted an "occurrence" resulting in "property damage." It is also undisputed that that the losses underlying the Milnot action occurred during the effective period of the Policies. Applying the language of the Policies "as written, either in favor of or against coverage, depending entirely on the language used," *Fed. Ins. Co. v. Int'l Bus. Machs. Corp.*, 18 N.Y.3d 642, 646, 942 N.Y.S.2d 432, 965 N.E.2d 934 (2012), the Court finds that Plaintiff has demonstrated that the damages alleged in the Milnot action fall within the scope of the Policies' coverage. As a result, Plaintiff is entitled to a defense in the Milnot action, and summary judgment in Plaintiff's favor is warranted on the duty to defend.[11]

### III. Duty to Indemnify

"Courts often distinguish between the duty to defend and the duty to indemnify in determining whether each issue posed in a declaratory judgment action is ripe for adjudication." *Atlantic Cas. Ins. Co. v. Value Waterproofing, Inc.*, 918 F.Supp.2d 243, 261 (S.D.N.Y.2013), *aff'd*, 548 Fed. Appx. 716 (2d Cir.2013). While the duty to defend is often resolved based upon the allegations of the underlying complaint and the terms of the policies, the duty to indemnify often involves a greater deal of factual inquiry, and "[c]ourts are concerned about becoming entrenched in a factual quagmire that has yet to be resolved in the underlying litigation." *Id.*

■ Here, Plaintiff asks the Court to find, as a matter of law, that Defendant has a duty to indemnify Plaintiff "for all damages asserted in the Milnot [a]ction." (Dkt. 40–7 at 6). Neither the underlying complaint nor the record in this case, however, provides any kind of itemization of the damages sought by Milnot. Instead, in the underlying complaint, Milnot

---

11. The Court does not foreclose the possibility that Defendant might be able to establish that one or more exclusions in the Policies applies to a category of damages in the Milnot action once the issue of damages is resolved. The only category of damages alleged in the parties' Statement of Facts is damages associated with the recall and disposal of the baby-food product. (Dkt. 40–6 at ¶ 12; Dkt. 44 at ¶ 12).

claimed monetary damages against Plaintiff in the lump sum of $1,522,122.00. (Dkt. 40–6 at ¶ 12; Dkt. 44 at ¶ 12; Case No. 08–CV–6140, Dkt. 1). While the parties in this case agree that the amount being sought includes expenses related to the product recall and disposal, it is unclear what other items of damages are being sought. Unsurprisingly, therefore, at oral argument, Plaintiffs counsel conceded that while Defendant's continued obligation to defend is ripe and appropriate for determination at this stage, Defendant's obligation to indemnify could be revisited after a trial on damages in the underlying action.

Because the nature of the damages being sought in the underlying action is not apparent from the underlying complaint or the record in this case, the Court cannot resolve the issue of whether Defendant has a duty to indemnify all losses in the underlying action.[12] As such, the Court withholds ruling on the question of indemnification until after a trial or other resolution on the issue of damages.

## IV. Estoppel

Plaintiff also argues that even if Defendant would not otherwise be obligated to defend and indemnify Plaintiff with respect to the Milnot action, Defendant is estopped from disclaiming coverage based on its prior conduct. Plaintiff seeks summary judgment on this basis. (Dkt. 40–7 at 16–19). Because the Court concludes that Plaintiff has demonstrated its entitlement to summary judgment as to Defendant's duty to defend based on the language of the Policies, and merely withholds ruling

12. Although the Court does not attempt to surmise what kind of damages will be proven in the underlying action, much less whether all of those damages fall within the indemnity obligations under the Policies, the Court notes that the Court of Appeals of New York has seemingly broadly construed the indemnity obligations of insurers in product recall cases.

on Defendant's duty to indemnify at this time, the Court need not reach this issue.

### CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment (Dkt. 40) is granted on the issue of the duty to defend, and Defendant's motion for summary judgment (Dkt. 39) on that issue is correspondingly denied. Plaintiffs motion for summary judgment on the issues of indemnification and estoppel is denied without prejudice, and Defendant's motion for summary judgment on the issues of indemnification and estoppel is similarly denied without prejudice.

After the issue of damages has been resolved in the underlying action, either party in this action may move the Court for a determination on the issues of indemnification and/or estoppel.

SO ORDERED.

See *Thomas J. Lipton, Inc. v. Liberty Mut. Ins. Co.,* 34 N.Y.2d 356, 359, 357 N.Y.S.2d 705, 314 N.E.2d 37 (1974) (concluding (albeit in dicta) that all elements of damages fell within insurer's indemnity obligations, including property damage to contaminated ingredients that had not yet been incorporated into the finished product and lost profits).